96 N.J. Super. 183 (1967)
232 A.2d 692
CAMBRIDGE ACCEPTANCE CORPORATION, PLAINTIFF,
v.
AMERICAN NATIONAL MOTOR INNS, INC., LEO HOCKSTEIN AND SYLVIA HOCKSTEIN, HAROLD S. OKIN, TRUSTEE, KENNETH E. KNOTTS AND FRANKLIN INDUSTRIES, INC. (R-WAY FURNITURE CO. DIVISION), THE DAILY JOURNAL DIVISION OF MID-ATLANTIC NEWSPAPERS, INC., F.K.M. ADVERTISING CO., INC., WELCH JENSEN AND SUSANNA E. JENSEN AND KNICKERBOCKER MAINTENANCE CORP., DEFENDANTS. THE OXFORD FINANCE COMPANIES, INC., PLAINTIFF,
v.
WILLIAM J. TAMBURRI AND CHICAGO TITLE INSURANCE COMPANY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division Superior Court of New Jersey, Law Division.
Decided July 12, 1967.
*186 Mr. W. Richard Kahn for Cambridge Acceptance Corporation (Messrs. Jeffers and Dillon attorneys).
Mr. Herman J. Ziegler, attorney for The Oxford Finance Companies, Inc.
Mr. Robert Silver for Leo and Sylvia Hockstein (Mr. Martin Simon, attorney).
Mr. Robert C. Thompson, Jr. for Kenneth E. Knotts (Messrs. Nichols, Thompson & Peek, attorneys).
Mr. John A. Willette for William J. Tamburri (Messrs. Williams & Willette, attorneys).
Mr. Peter L. Berkley for Chicago Title Insurance Company (Messrs. Riker, Danzig, Scherer & Brown, attorneys).
FRITZ, J.S.C.
This is a Chancery action for foreclosure of a mortgage on real estate consolidated with a law action for damages involving the same transactions. The foreclosure phase appears to involve questions of first impression in New Jersey.

I  The Chancery Action
In October 1963 Leo Hockstein was the owner of a parcel of vacant land of about 1 1/2 acres in Denville Township. During that month he contracted with Associated Realty Company (hereafter Associated) by means of a written instrument which ostensibly gave Associated "executive authority *187 to sell the property" but which, it is clear from interlineations, obviously looked toward a lease. This contract had written into it as an "additional provision[s]" the following: "The lessor will subordinate to 75% of appraised value of land and building by a recognized financial institution granting both construction and permanent mortgages."
On April 15, 1964 Associated wrote Hockstein advising him of the offer of American National Motor Inns, Inc. (hereafter American) to lease the property. On April 28, 1964 Hockstein and American entered into a written agreement of lease. The term of the lease was for 65 years "commencing on the [a blank here was not filled in] day of April, 1964." Rent of $666.66 per month was not to commence until "the first day of the fifth month after the issuance of" building permits for which provision was also made in the lease, the expressed intention of the lessee being the construction of a motel upon the land.
This lease was prepared by American. It was on its printed form, with blanks provided only for the date, the name of the lessor, the location and the description of the property, the term of the lease and the rental amount.
It required American, at its own expense, to "commence construction and with due diligence complete for use and occupancy a motel fully paid for and free from all liens excepting only the mortgages referred to in Paragraph 6 hereof." It contemplated 52 "rentable motel units." It is not without significance that these were to revert to the ownership of the landlord at the termination of the lease.
The lease dealt with the matter of American's right to mortgage the premises, in extenso and in express terms. The following appeared:
"6. LANDLORD acknowledges that TENANT will require financing to construct the above mentioned motel and by reason thereof, LANDLORD agrees that TENANT shall have the right during the term of the Lease to place mortgages on all or any portion of the Demised Premises as security for loans. Such mortgages shall provide for repayment no later than twenty-five (25) years from the date of completion of the motel. TENANT shall make all interest *188 and principal payments required under such mortgages. This Lease is hereby made subordinate to all future mortgages, including those referred to in Paragraphs 8 and 17 of this Lease, without the necessity of any further acts, provided the aggregate amount of such mortgages does not exceed Fifty-Five Hundred Dollars ($5,500.00) per motel unit, the number of motel units to be computed as provided in Paragraph 3 of this Lease. However, as further assurance in this connection LANDLORD shall execute promptly upon TENANT'S request any agreement in form requested by TENANT evidencing such subordination. LANDLORD shall perform any act or acts required by the lenders to whom such mortgages are given or to the title insurance company insuring the same in order to consummate such loans. LANDLORD agrees that if it shall fail to perform such act or acts within seven (7) days after request by TENANT, LANDLORD shall be liable for all damages and expenses sustained by TENANT and incurred in consequence of such delay.

* * * * * * * *
8. TENANT shall have the right at any time before payment in full of the mortgages referred to in Paragraph 6 above to refinance the principal balance remaining due on such mortgages provided that the maturity dates of any new mortgages shall not be more than twenty-five (25) years from the date of completion of the motel. Such refinancing shall be at TENANT'S sole expense. LANDLORD shall upon request by TENANT perform any of the acts required of LANDLORD pursuant to Paragraph 6 to consummate the original mortgages.

* * * * * * * *
17. If TENANT exercises its option under Paragraph 6 of this Lease, TENANT may subject the Demised Premises to a construction loan mortgage covering such buildings or improvements or to a consolidated mortgage covering both new and existing buildings and improvements. Any new or consolidated mortgage shall be payable within twenty-five (25) years from the date of the new loan or on or before the fifth year immediately prior to the end of the term of this Lease, whichever is sooner. LANDLORD shall in such event perform all of the acts required under Paragraphs 6 and 8 in connection with the original financing.

* * * * * * * *
21. Wherever in this Lease the word mortgage is used, it shall be deemed to include a `Deed of Trust' where the use of the latter is customary or desired in the state or area in which the Demised Premises are located, and shall also be deemed to include interim mortgages during construction and permanent mortgages after completion of the motel.
22. LANDLORD agrees that the mortgages on the Demised Premises referred to in Paragraphs 6, 8 and 17 of this Lease shall upon recordation be first liens on the Demised Premises, subject only to liens for current property taxes and special assessments. * * *."
*189 The lease was recorded in the office of the Morris County Clerk on August 5, 1964.
On a date in June 1964, which does not appear, Hockstein executed a "Subordination Agreement" reading as follows:
"THIS INDENTURE made and entered into this day of June 1964, between LEO HOCKSTEIN of 35 E. Lincoln Street, Verona, New Jersey, hereinafter referred to as `Owner' and AMERICAN NATIONAL MOTOR INNS, INC. a corporation originating and existing under the laws of the State of New Jersey hereinafter referred to as `Mortgagor' and FIRST NATIONAL CREDIT CORPORATION, a New Jersey Corporation of 60 Park Place, Newark, New Jersey hereinafter referred to as `Mortgagee'.

WITNESSETH:
WHEREAS the owner is the fee holder of certain lands and premises situated in Tax Block 128A, Lot 2, in the Township of Denville, County of Morris and State of New Jersey, which premises are more particularly described in a certain lease dated April 28, 1964 between owner as Landlord and AMERICAN NATIONAL MOTOR INNS, INC. as Tenant.
WHEREAS said AMERICAN NATIONAL MOTOR INNS, INC. is in the process of erecting and constructing on the aforementioned leased premises a fifty-eight (58) room motel with Gate House and other appurtenances; and
WHEREAS FIRST NATIONAL CREDIT CORPORATION has agreed to advance construction monies to assist in the erection and construction of the aforementioned motel building, gate house and other appurtenances and AMERICAN NATIONAL MOTOR INNS, INC. has agreed to execute and deliver its mortgage as security for the construction loan to which mortgage this agreement shall be attached and form a part.
NOW THEREFORE, in consideration of the sum of One ($1.00) Dollar and other valuable consideration, owner hereby subordinates its fee title to the premises described in the aforementioned lease and mortgage to the lien of said mortgage in the sum of ONE HUNDRED THOUSAND DOLLARS ($100,000.00) to the end that said mortgage shall be a first and paramount lien on the premises therein described. It is expressly understood and agreed that this subordination shall apply only to owner's interest in and to aforementioned premises and shall in no wise be construed so as to subject owner to any personal liability whatsoever for the indebtedness secured by the mortgage or of any act or acts required to be performed by the Mortgagor under said mortgage. * * *." (Emphasis supplied)
On June 18, 1964, on application of American, the board of adjustment of Denville Township recommended to the township committee the granting of certain variances required to permit the construction of American's motel.
*190 It appears that American had arranged with First National Credit Corporation (hereafter First National) for certain financing in connection with this venture. First National was in the business of real estate financing through loans historically declined by banks. It had done business with American before in connection with motel construction, for a period of at least two years. Generally, its loans to American were for a six-month period and were for the purpose of construction and completion of the motels. Over the years First National had financed about 1 1/2 million dollars of American's motel construction. As many as eight motels may have been involved, of which Denville was among the last. In the case of some of these motels American owned the land. In other cases, where the land was not owned by American, subordinations were secured from the landowner.
A closing between First National and American in connection with financing proposed for the Denville site was scheduled for June 19, 1964, but was postponed in order that an existing mortgage on the premises, held by a bank, might be discharged. This mortgage was discharged by an instrument dated July 9, 1964, but not in fact recorded until August 5, 1964.
On July 1, 1964, the Denville township committee concurred in the recommendation of the board of adjustment relating to the variance and granted the same subject to certain restrictions.
Earlier, First National had sought the participation of The Oxford Finance Companies, Inc. (hereafter Oxford) in financing which First National anticipated handling for American in its construction of motels at Denville and elsewhere.[*] Such participation had been discussed in depth *191 between officers of Oxford and First National sometime before the Denville mortgage closing. Financing arrangements for other motels similar to those which eventuated in connection with the proposed Denville motel preceded the Denville closing.
While of limited significance since, absent controlling equities, First National's assignees stand in its shoes, R.S. 46: 9-9, certain facts relating to Oxford's participation appear clear. Prior to the closing on the American mortgage to First National, and not later than July 10, 1964, Oxford knew that First National proposed to lend at least $57,500 to American in connection with American's proposal to erect a motel on the Denville land. Oxford knew that American was not the owner, but had leased this land from the owner. It knew that American proposed to secure its obligation to First National with a mortgage on the land. It was anticipated that First National would refinance at least a portion of this loan with Oxford, which was to advance $46,000, and that Oxford would receive from First National an assignment of American's note and mortgage as well as a note from First National, personally endorsed by its president. Oxford was even then sufficiently concerned about the relationship between the owner and the lessee that it promulgated, as a condition precedent to its loan, a requirement that American's mortgage be endorsed by the landowner. It also required that it receive a copy of the lease between the owner and American.
On July 13, 1964 Oxford forwarded $46,000 to William J. Tamburri, attorney for First National, as "the proceeds of a loan to the First National Credit Corp." These monies were to be disbursed by Tamburri only upon satisfaction of some seven escrow conditions, including the receipt by Oxford of a note of American in the amount of $57,500 payable to First National and assigned by them to Oxford, and a first mortgage on the Denville property running to First National, to be "executed by the title holder of the property and by American National Motor Inns as the *192 lessee." Receipt of a copy of "the lease on the subject premises between the title holder and American National" was also an escrow condition. Oxford required, as well, "A title insurance policy * * * insuring that the aforesaid mortgage is a valid and subsisting first lien on the subject property as the interests of Oxford and First National may appear."
On July 2, 1964 Chicago Title Insurance Company had issued a preliminary certificate and report on title, also called an interim title insurance binder, on the application of First National. By letter of July 13, 1964 an amendment including The Oxford Finance Company as a "proposed insured" was added.
On July 14, 1964 American executed a note to the order of First National in the face amount of $100,000, payable six months thereafter, with interest at 6%. This note recited, inter alia:
"Whereas buildings or improvements are in process of construction or to be erected on the premises described in the accompanying mortgage and
Whereas First National Credit Corporation, the obligee herein, has agreed to make the loan herein described to be paid over to the obligor herein in installments as the work progresses, the time and amount of each advancement to be at the sole discretion of the said obligee, so that when sufficient work on said premises shall have been completed to its satisfaction, the said obligee shall pay over to said obligor any balance necessary to complete the full loan of One Hundred Thousand and 00/100 .... ($100,000.00) Dollars."
The mortgage referred to therein was executed the same day by American and only by American. Its drafting was accomplished by filling in blanks on a printed form published by Julius Blumberg, Inc., Law Blank Publishers, and said to be a "N.J. Statutory Mortgage. Act of 1918. Individual or Corporation." The following paragraph was a typed addition:
"Whereas buildings or improvements on said premises are in process of construction or repair, or to be erected or repaired; and whereas the said party of the second part [obviously First National *193 although the instrument refers to it as "Mortgagee" rather than party of the second part] has agreed to make the loan herein described to be paid over to said party of the first part [obviously American, the mortgagor] in installments as the work progresses, the time and amount of each advancement to be at the sole discretion and upon the estimate of said party of the second part, so that when all of the work on said premises shall have been completed to the satisfaction of said party of the second part, said party of the second part shall then pay over to said party of the first part any balance necessary to complete the full loan of One Hundred Thousand and no/100 ($100,000.00) Dollars; and whereas the party of the first part agrees to complete the erection or repair of said buildings to the satisfaction of said party of the second part within a reasonable time from the date hereof or at the latest on or before six (6) months from this date."
The mortgage was recorded August 5, 1964.
On July 14, 1964, contemporaneously with the execution and delivery to First National of American's note and mortgage, American and First National jointly executed a "Memorandum of Loan Agreement." This acknowledged that "the Lender [First National] is relying on the truth of all of the said statements in making the loan hereinbefore mentioned." In this memorandum American forthrightly stated that the proceeds of the loan were "to be used by [American] for the purpose of conducting and maintaining its corporate business and for the purpose of paying certain of its obligations." The memorandum memorialized the first payment from First National to American thusly: "At the time of the execution and delivery of this agreement [First National] will lend to [American] the sum of Fifty Thousand Dollars ($50,000.00) cash, said monies to be used by [American] for the purpose of conducting and maintaining its corporate business." There was further provision for the payment to American and rebate by them to First National of an additional $7,500 frankly acknowledged to be a "bonus."
Prior to this closing on July 14, First National knew that American was not the owner, but had leased the land. The lease, or a copy, had been available to First National, and its officers were aware of its terms. They knew, for instance, *194 that if test borings were not suitable for the construction of a motel, American could, at its absolute option, terminate the lease.
First National delivered two checks to American, the first for $50,000 and the second for $7,500. American endorsed the latter and returned it to First National.
Simultaneously with this loan and mortgage closing, or at least on the same day, Tamburri paid over to First National the $46,000 received from Oxford. He received a note in the same amount from First National, personally endorsed by its president, and by a letter of the same date forwarded it to Oxford. At the same time he also forwarded American's note, assigned to Oxford by endorsement, a copy of the title binder, and a copy of the lease. He wrote Oxford that he had forwarded the mortgage for recordation and would advise Oxford "as to its return."
It is abundantly clear that First National had reviewed both the lease and the subordination agreement prior to the closing on July 14.
With this first payment to American by First National, as with two subsequent "advances" about which more is to be said, no conditions were imposed by First National with respect to use of the money. Endorsement on the $50,000 check indicates the funds were deposited in American's "Master Account." There was, as First National's president testified, no follow-through. In addition, while the determinants with respect to the timing of the advances does not appear, it is clear that there was no consideration by First National of timing based on stages of construction.
As noted above, the lease and the mortgage were recorded on August 5, 1964.
On August 21, 1964, First National executed an assignment of the American mortgage in favor of Oxford, and forwarded this under cover of a letter of the same date which served as well to transmit to Oxford the original mortgage. This assignment was also merely a filling in of blanks on a Julius Blumberg, Inc. printed form, and purported to assign *195 the entire mortgage "in consideration of the sum of ONE DOLLAR ($1.00) and other good and valuable consideration." This assignment was not recorded until July 6, 1965. A vague explanation appears that this recording was delayed by arrangement with First National.
Some time during August 1964  probably subsequent to the recordation of the lease and mortgage on August 5, 1964, and before the end of the month  Kenneth E. Knotts considered generally with First National his participation in the American motel financing being undertaken by First National. Knotts decided to invest. It does not appear whether the Denville proposal was mentioned in the initial discussions, although at least one other motel, that at South Hackensack, was specifically considered. On September 3, 1964, by way of a letter captioned "American Motor Inn-Mtg. Hackensack Property," Knotts forwarded to Tamburri a check for $50,000 "which you are to hold in escrow pending the above closing at which time you will see that I receive a properly executed mortgage and necessary documents to protect my investment." The enclosed check was payable to the order of "Wm. Tamburri, Attorney for First Nat'l Credit Corp," was endorsed precisely that way by Tamburri, and was further endorsed to the order of a bank by First National. On September 11, 1964 First National acknowledged receipt of this check by a letter which advised that the funds were to be used "for participation in first mortgages on sites and buildings project of American National Motor Inns, Inc. located at West Reading, Pennsylvania, Hackensack, New Jersey and Stratford, Connecticut." Parenthetically, it should be observed that First National at this time told Knotts it was "anticipated that these mortgages will be liquidated in a period no longer than six months; however, for our own purposes we can figure on December 15th for liquidation of these items." An entirely reasonable inference may be drawn that First National considered this mortgage financing as a construction mortgage.
*196 This letter confused Knotts, who had already participated in the West Reading financing prior to this time. He brought this apparent inaccuracy to the attention of First National. While the date of Knotts' communication with First National in this respect does not appear, and is probably not significant, on November 18, 1964 Tamburri confirmed to Knotts, by letter, his participation in the three motels mentioned in the First National letter of September 11. Again, it should be noted Tamburri advised "that I will turn over said sums [Knotts' investment] to you out of the final construction payments."
By December 15, 1964 the matter had been straightened out. First National wrote Knotts confirming "your participation as we discussed it: Stratford - 17; Hackensack - 17; and Denville - 16." With this letter First National forwarded a copy of the Denville mortgage to Knotts.
Tamburri confirmed First National's advice by his own letter of December 22, 1964, and again noted that he would turn over to Knotts the sums he had invested "out of the final construction payments."
Knotts' total reliance on First National is apparent. At least prior to March 1965 he did not have actual knowledge as to who owned the properties in which he was investing, or the nature of his investment beyond the fact that he thought it was a first mortgage. This conclusion was produced solely by the assurances of First National, and Knotts' reliance was bottomed solely on these assurances. He made no searches and engaged no counsel. As a matter of fact, his reliance on First National was so complete that, at least at the outset, he had no concern over the type of mortgage said to secure the indebtedness. He simply thought he had "a participating first mortgage."
After awhile he did become concerned, and in March 1965 he consulted an attorney. His attorney was advised by letter of March 15, 1965 from First National Credit Corporation that "Mr. Knotts holds participating interests with First National Credit and others" in certain properties, *197 including Denville which was listed at $16,000. First National's assignment, dated March 16, 1965, was enclosed. This purported to assign the security of the American mortgage to "the extent of a participation interest in the amount of Sixteen Thousand Dollars ($16,000.00) on lands in the Township of Denville * * * to secure the payment of the sum of One Hundred Thousand Dollars ($100,000.00)." The assignment made reference to the book and page recordation of the mortgage. Knotts recorded his assignment on March, 19, 1965.
In the meantime, First National had, on September 9, 1964, made a further "advance" on its loan to American. The transaction again involved a "bonus" rebated to First National, and $2,000 was returned as the bonus. The next day American entered into a contract with American National Construction Company, Inc. (a subsidiary of, or at least controlled by, American) for the construction of a 58-unit motel at Denville.
On September 21, 1964 Hockstein and American granted a storm drain easement to the Township of Denville "for the purpose of maintaining, cleaning and repairing a storm drain with the drainage pipe therein contained now in the process of being constructed on said property by [American]." This instrument recited ownership in Hockstein and a leasehold interest in American. It was recorded on September 24, 1964.
That Oxford amply understood the precariousness of its position is demonstrated by a letter from Oxford to First National dated September 28, 1964. Oxford recited its understanding that "there are Subordination of Title Agreements, but we do not have copies of same. However, the existence of these documents, per se, does not provide us with an insurable title position as required in our commitment letters [a reference to Oxford's letter to Tamburri of July 13, 1964, discussed supra]." Oxford "suggested" to First National that it be furnished with an "[u]nconditional opinion letter from Mr. Tamburri in each instance indicating *198 our first position," and copies of the "Subordination of Fee" agreement. It urged that First National contact "the title insurance carrier to speed up the issuing of a final policy insuring the position of Oxford." Finally, it reflected the writer's investigation of the limits of Tamburri's "professional liability coverage" and suggested that he increase those policy limits.
On October 5, 1964 the State Highway Department approved American's application of August 18, 1964 for a permit for attachment to the storm drain, and a permit for such access issued on October 6, 1964.
The third and final "advance" from First National to American took place on October 6, 1964, at which time First National paid American $11,000 and took back from it $1,000 as a "bonus." Thus, the entire amount advanced by First National was $90,500, of which $10,500 was returned as a bonus. Oxford's contribution to First National was $46,000. Knotts' participation in the fund was $16,000. It is appropriate here to note that none of this capital was returned by any obligor to any obligee.
On July 6, 1965 Oxford recorded the First National assignment of mortgage. On December 21, 1965 First National assigned the Hockstein subordination agreement to Oxford.
While there is a dearth of direct evidence in the case, it would appear beyond dispute that both American and First National are in bankruptcy.
A number of other facts appear clear beyond dispute. No "construction" was ever commenced on the Denville site. Monies were expended to obtain an insurance policy and a building permit. It is a reasonable inference that monies were expended in the obtaining of a variance. There was a suggestion that monies were expended for architects' fees, although this is not so clear that a finding thereof may be made: there was testimony that the design of American motels was more or less standard. There is no proof at all that any of the monies loaned by First National, or by *199 Oxford or Knotts, were spent on any of the aforementioned items. In fact, there is no proof whatsoever as to what was done with the funds which were loaned by First National, except that they went, in part at least, into the American master account. Of course, funds rebated by American, a total of $10,500, were not spent for construction purposes, unless the promise of a bonus to insure the securing of a loan is deemed to be a construction purpose. We are not disposed so to view it.
It is also clear that beyond a visit by First National to the site prior to its lending money for the Denville project, neither First National nor Oxford nor Knotts displayed any interest in ascertaining the use to which their money was being put. None visited the site, except as noted immediately above. None made inquiry either of American or Hockstein. None claims to have attempted to assert any control over the use of the funds.
An additional factual finding is here appropriate. The suggestion by Hockstein appears that the subordination agreement was fraudulently obtained, and that the note and mortgage from American to First National were "sham documents." In fact, a conspiracy is charged. There is no proof to support these charges. First National candidly admitted that it did not believe the funds it advanced to American necessarily had been applied to construction of a motel, although it acknowledged that it recognized an obligation they must be used in the Denville operation. This is a far cry from a concession of either fraud or conspiracy. However ill advised the venture may have proved to be, we are satisfied that it was undertaken as a high-risk project, but in good faith.
Another argument of the defendant Hockstein is amenable to summary disposition. He urges that there was either no consideration or a failure of consideration for the subordination agreement. It is of no moment. The lease itself, in which Hockstein granted unto American the right to mortgage the premises for construction monies, effectively *200 subordinated the fee title to the lien of a construction mortgage, at least in equity. This being so, it appears that the consideration for the lease in any event served as consideration for giving effect to its terms by way of a subordination agreement.
The substantial question presented appears novel in New Jersey.
If an owner of lands subordinates his fee title to a mortgage to be given by his lessee, and the instruments of subordination demonstrate an intent that the funds obtained from an obligation secured by such mortgage be used for construction purposes, is the interest of the mortgagee or his assignee in the land superior to that of the owner in the absence of proof that the funds were spent for construction purposes?
It must be seen at the outset that the matter is not simply one of the assignment of priorities. The assistance of the courts has been constantly sought by mortgagees seeking an adjudication of priority over other mortgagees and judgment creditors, or by mechanics' lienors doing battle with other lien claimants over priority. Hoag v. Sayre, 33 N.J. Eq. 552 (E. & A. 1881), is the sire of a large family of decisions dealing with these problems. The so-called circular priority has been the subject of considerable scholarly exploration, e.g., Gilmore, "Circular Priority Systems," 71 Yale L.J. 53 (1961). Each of these garden-variety disputes has involved comparative priorities of rights in land other than title, acquired subsequent to the acquisition of title by the owner, and preserved, advanced or retarded, vis-a-vis each other, by the action or inaction of the parties acquiring the right. The case sub judice differs. It concerns, instead, the intentional defeasance of some quantum of full ownership less than the whole, and the advertent derogation of a title which would be complete and perfect without such an act. We believe the considerations in these circumstances are not necessarily identical to those in litigation between conflicting lien claims each of which is (or was) *201 junior to the actual title. The difference is that in the latter case the respective claimants are essentially both members of the same class: disputants arguing about how the pie shall be cut. In the instant action, the principal claim is not among members of this one class, but between two classes: the pie cutters and the owner of the pie and the knife.
We start with the proposition that, as among the parties hereto, prior to the lease no one other than the owner, Hockstein, had any rights in the Denville land. Hockstein's lease to American voluntarily surrendered to that motel company certain rights theretofore his alone. What that surrender encompassed is to be and may be divined by determining the intent of the parties as manifested in their contract of lease. See Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293 (1953); Casriel v. King, 2 N.J. 45 (1949).
Among other things, Hockstein surrendered and American obtained the exclusive right to use the property for the term of the lease, and to erect a motel thereon. It also obtained the right to place certain mortgages on the property. We are satisfied from the language of the lease that this right to mortgage was limited to the right to subject the property to the lien of its mortgage for construction purposes only. Paragraph 6 of the lease, which initially confers this right upon American, does so in a sentence which preliminarily acknowledges the necessity for "financing to construct the * * * motel." The lease expressly limits the subordination of the lease to future mortgages to the extent of $5,500 "per motel unit." Paragraph 17, in referring to the option granted under paragraph 6, specifically refers to "a construction loan mortgage." There is no grant of a right to mortgage other than that expressly given for construction purposes. While "permanent mortgages" are mentioned in paragraph 21, they are mentioned only in a context of "after completion of the motel."
*202 The intent of the parties, as clearly manifested, was that American should have the limited right to subject the property to the lien of a mortgage securing an obligation the funds of which were to be used for construction purposes.
It should be here noted that such a determination disposes, as well, of Hockstein's allegation that the ultimate mortgage by American was only a leasehold mortgage. This is not so. It did confer upon American the right to impose a lien on the fee, but only to the extent noted above. American received no more and no less. Its authority to encumber the title was thus limited.
At this point Hockstein had remaining to himself all the other rights and advantages of fee title save those which he contracted away: vis., possession of the land for the term of the lease and the right to impose the lien of a construction mortgage.
The only other act of Hockstein was the execution of the subordination agreement in June 1964. Although paragraph 6 of the lease, in conferring upon American the right to mortgage for construction purposes, probably made the execution of such an agreement unnecessary since the lease itself subordinated the fee to the lien of a construction mortgage, the lease also required Hockstein to "execute promptly upon [American's] request any agreement in form requested by [American] evidencing such subordination." American could and did require this subordination agreement. However, it is apparent from the subordination agreement that it surrendered no more of Hockstein's rights than did the lease. It referred to the lease. It specifically anticipated the advance by First National of "construction monies." It contemplated a mortgage by American for a "construction loan." It subordinated "fee title * * * to the lien of said mortgage."
Beyond use of the land for the period of the lease, Hockstein never surrendered, and American never obtained, more than the right to impose a lien for construction monies. In equity, at least, American can be said to have promised, in *203 exchange for this right to impress such a lien, that the monies so obtained would be used for construction purposes.
First National had precise knowledge of this state of facts before the money was loaned and the mortgage was accepted. Oxford knew at least that the mortgagor was not the owner, but a motel building lessee, and that it was proposed the monies to be loaned were to be used for construction purposes. Beyond such actual knowledge, in view of the nature of Oxford's business and with particular regard for its past experience with First National and American in other motel financing where subordination agreements from owners had been required, it was on ample notice to inspire further inquiry. Its recognition of such a duty is expressly acknowledged in such instruments as a "Loan Resume" of July 10, 1964, reflecting its insistence that it receive a copy of the lease and that the owner endorse American's mortgage.
By the time Knotts entered the picture the lease had actually been recorded, and if the facts were not known to him, they should have been. He, too, had participated in at least one prior First National-American project.
We believe the matter is controlled by Albert & Kernahan v. Franklin Arms, 104 N.J. Eq. 446 (E. & A. 1929), and that an application of the law of that case disposes to substantial justice here. There the holder of a first mortgage consented to the postponement of the lien of its mortgage to that of a trust mortgage, the trustee of which agreed that the money to be advanced thereon should be appropriated to the payment of expenses incurred in the erection of an apartment house. Some monies were expended for that purpose. Additional sums were spent otherwise. It was held that only the lien of the money actually used for construction purposes was entitled to priority over the subordinated first mortgage.
We recognize that the foreclosing plaintiff in the instant action, standing in the shoes of its assignor-mortgagee, is once removed from the position of the trustee in Franklin *204 Arms, but this does not render inapplicable the rationale of the holding of that case. In essence it was there determined that the postponement of a priority is limited in effect by the terms of the postponement, and the acts of others cannot extend this limitation.
Speaking of a determination of priority as to certain mechanics' liens, the court said:
"* * * [I]ts mortgage retained its priority over all existing or subsequent liens, except that of the trust mortgage, to the extent already indicated. It did nothing which deprived it of its status as the holder of the first encumbrance upon the property, except to that extent, and no additional burthen can be put upon the mortgaged premises to its financial injury * * *." (at p. 449)
As there, it can be readily said here that Hockstein retained the priority of his fee title over all existing or subsequent liens, except that of a construction mortgage to the extent the money was used for construction. He did nothing which deprived him of his status as the holder of the first "encumbrance" upon the property  fee title  except to that extent, and no additional burden could be put upon his premises to its financial injury. Essentially, Hockstein enjoyed the priority of fee title, subordinated, postponed and limited only to the extent to which his actions limited it.
Paraphrasing Franklin Arms, which stated that "no subsequent lien [to the first mortgage] upon the property can be advanced to its detriment unless it consents thereto" (at p. 449), we hold that no lien on the Hockstein property can be advanced to the detriment of fee title except to the extent of Hockstein's consent thereto, vis., monies used for construction purposes.
Plaintiff endeavors to distinguish Franklin Arms by pointing out that there the second mortgagee agreed his investment was to be used for construction purposes. This fact does not alter the thrust of the case which turns, not upon the promise of the second mortgagee, but upon the limitation on the subordination imposed by the subordinating first *205 mortgagee. Vanderhoff v. Wasco, 109 N.J. Eq. 463, 467 (Ch. 1932). Even were this not so, an implied agreement in the instant case can and, in equity, should be spelled out from First National's actual knowledge of all the provisions of the lease in general, and of the mortgage provisions therein in particular. In the superior position of a financial institution constantly engaged in professional high-risk lending, First National had no reason to believe American's mortgage conferred any lien to which the fee was subordinate other than to the extent of money spent for construction purposes. It had every reason to believe otherwise. Its loan under the circumstances cannot be viewed other than as an implied consent. Neither Oxford nor Knotts is free from the imposition of these equities, in law (R.S. 46:9-9) or in fact. The knowledge of both as to the critical circumstances was or should have been equal to that of First National. Oxford was concerned about the priority of fee title to the extent that its escrow letter prior to closing required the "first mortgage" to be "executed by the title holder of the property." Knotts, who, as noted, had participated with First National and American before, had at least constructive knowledge of the express terms of the recorded lease.
It is conceded there was no construction. As against the argument that site preparation, such as securing a variance, is "construction," the proof with regard to the expenditure of such money and the cost thereof is meager and unconvincing. There is no proof that First National or Oxford or Knotts money was expended for these purposes.
Accordingly, we conclude that such lien as the mortgage in question or its subsequent assignment might have conferred should not be "advanced" or "preferred" to Hockstein's fee title, diminished as it was only by a subordination for construction money. Since Hockstein's fee interest is superior to the claims here advanced, foreclosure would be futile and will not lie.
Plaintiff urges that it should be favored in equity because the owner was negligent in taking any of the "readily *206 available precautions" "before agreeing to permit the mortgaging of his fee interest." This argument loses sight of the fact that he did take the precaution of limiting this permission to the lien of construction monies. We are aware of the rule that generally where a loss must be borne by one of two innocent persons, equity will impose the loss on that party whose act first could have prevented the loss. Stone v. Limouze, 111 N.J. Eq. 421 (E. & A. 1932); Zabriskie v. Mack, 132 N.J. Eq. 516 (Ch. 1942); Wilson v. Walsh, 105 N.J. Eq. 396 (Ch. 1929). However, this rule of estoppel finds its principal application in fraud cases. We find no legal, equitable or actual fraud here. We do not believe the rule applicable as against Hockstein.
Here, First National, with full knowledge of the lease and subordination agreement, disbursed the funds without limitation. Its complete disinterest in the application of the funds, except for the requirement of "bonus" rebates exceeding 10% of the loan, which could not possibly constitute funds to be used for construction, amounted to a failure to prevent the loss far more culpable than that of Hockstein, under all the circumstances. We conclude, additionally, that equitable estoppel is available as against the claim of First National and its assignees.
Plaintiff has brought to our attention the cases of Brooklyn Trust Co. v. Fairfield Gardens, Inc., 260 N.Y. 16, 182 N.E. 231 (Ct. App. 1932), and Iowa Loan & Trust Co. v. Plewe, 202 Iowa 79, 209 N.W. 399 (Sup. Ct. 1926). Neither of these involved a subordination of fee title: each was a battle of priority between mortgagees. In neither case does it appear that the subordination instrument by its terms contemplated a construction mortgage, although probably in the Brooklyn Trust case there was some reference to a building agreement.
Beyond these factual distinctions we perceive a conflict between the philosophy of the Franklin Arms case, supra, and these cases, representing a fundamental jurisprudential difference between those states, at least, and ours. This is *207 not surprising. New Jersey has long limited the advantage sought to be gained by reliance on the morals of the market place. Direction is to be found, for instance, in our rules controlling the conduct of persons in a quasi-fiduciary capacity. These remain more demanding than those of many other jurisdictions, despite criticism elsewhere of the concept. Judson v. Peoples Bank and Trust Co., 25 N.J. 17, 28 (1957).
A difference in view between New Jersey and New York with respect to the standards required of the commercial community is not without precedent. Our respective treatment of statutes prohibiting corporations from asserting usury as a defense serves as an example. In re Greenberg, 21 N.J. 213, 220 (1956).
The particular equities discussed heretofore conduce to the conviction that the philosophy thus expressed in the Franklin Arms case, as we view it, is most appropriately invoked here.
Our adjudication makes it unnecessary to decide Knotts' interest vis-a-vis Oxford. Nor do we need now to determine the effect of Knotts' previous settlement in the Essex County action in which he was plaintiff.
In the Chancery action there will be judgment in favor of defendant Hockstein, without costs.

II  The Law Action
Oxford also sues Chicago Title Insurance Company (hereafter Chicago) and Tamburri, at law. It charges these defendants with negligence in the examination of title, and an alleged breach of warranty on their part with respect to certification of title. In addition, it complains that Chicago breached a contract of title insurance and that Tamburri violated a trust imposed by the imposition of escrow conditions.
Consideration of the issues thus raised requires a determination at the outset of the relationships which existed between *208 Oxford and these defendants. It is perfectly clear that Tamburri was the attorney for First National. He was retained by it, and not by Oxford. As will appear, it was to him the Oxford monies were sent, under cover of an escrow letter, for disbursement to First National, and pursuant thereto he became an escrow agent in the transaction. His relationship with Oxford was thusly limited.
Chicago, as its corporate name suggests, is a title insurance company which issued a so-called binder in which Oxford was described as a "proposed insured."
We conclude from this analysis of the relationships that the charges of negligence in the examination of title need not delay us long in our approach to the real issues. We perceive no legal duty in this respect owed by either defendant to plaintiff.
The conduct of Oxford supports this view. There is no suggestion of reliance by it upon the skill of either defendant in title examination. The evidence is to the contrary. Despite the issuance of a title binder prior to either the First National or the Oxford closing, Oxford manifested its concern with Chicago's position by repeated inquiry which ultimately resulted in the "certification" by a letter of September 23, 1964, about which more is said below. As to Tamburri, Oxford sought protection from any negligence on his part by carefully and precisely detailing his duty in escrow conditions designed to avoid the harm of such negligence: these required execution of the mortgage by the title holder and the issuance of a title policy insuring that the mortgage was a first lien.
We turn to the other issues.
As has already been related, on June 25, 1964 Chicago issued a preliminary certificate and report on title, also called an interim title insurance binder, on the application of First National. This recited the application of First National for a title insurance policy in connection with certain property described therein (the premises in question in the foreclosure action) upon the "proposed mortgage from" *209 American. This recital involved striking out the words "Permanent loan" in detailing the purpose of the mortgage, leaving the words "Construction loan" to remain. It showed marketable title in Hockstein and his wife, expressly noting a lease to American. Chicago's obligation is succinctly stated in one paragraph:
"The undersigned, CHICAGO TITLE INSURANCE COMPANY, by this Interim Title Insurance Binder hereby insures you against loss or damage not exceeding $100,000.00 which you, as mortgagee under the mortgage referred to in the caption of the foregoing First Certificate and Report on Title [the American construction mortgage] of ____ may sustain by the failure of said First Certificate and Report on Title to correctly reflect the record title to the property herein described as of the date and hour thereof; such insurance to be null and void unless title policy is issued by the undersigned in connection with said mortgage within nine (9) months from the date hereof and the premium thereon paid."
On July 13, 1964 a letter from Chicago added Oxford as a "proposed insured."
On July 13, 1964 Oxford forwarded $46,000 to Tamburri by a letter from its general counsel, the subject matter of which was said to be "RE: Loan To First National Credit Corp. in the Amount of $46,000.00 on Terms and Conditions hereinafter set forth. American National Motor Inn, Denville, N.J." After noting the enclosure of Oxford's check in the amount of $46,000, the letter continued, "These monies may be disbursed by you only upon satisfaction of the following requirements: * * *."
The following escrow conditions appear:
"1. First National shall execute a note in favor of Oxford in the sum of $46,000.00 to be repaid in six (6) months with the option to extend for an additional three (3) months, with interest calculated at the rate of fourteen (14%) per cent per annum, to be billed monthly.
2. The said note signed by First National shall be personally endorsed by Alan Turtletaub.
3. Oxford shall also receive a note in the amount of $57,500.00 made payable to First National and signed by American National *210 Motor Inns, Inc., which said note will be assigned to Oxford by First National.
4. A first mortgage shall be created on 1.1 acre of land situate at Route 46, West Main Street, Denville, New Jersey, upon which will be built a fifty-eight (58) unit motel. This first mortgage shall be in favor of First National in the sum of $57,500.00 and shall be executed by the title holder of the property and by American National Motor Inns as the lessee. Said mortgage must be assigned to Oxford by First National.
5. A title insurance policy from a reputable and responsible title insurance company must be issued insuring that the aforesaid mortgage is a valid and subsisting first lien on the subject property as the interests of Oxford and First National may appear.
6. Oxford must be furnished with a copy of the lease on the subject premises between the title holder and American National.
7. Oxford must receive a current financial statement of American National." (Emphasis added.)
Immediately following these conditions, the writer instructed:
"If any of the above requirements cannot be satisfied, there must be no disbursement of funds. Telephone the undersigned for further instructions and any waiver of the above requirements must be authorized expressly by the undersigned."
As noted heretofore, the transaction closed on July 14, 1964. The mortgage was not, in fact, then or ever executed by the title holder Hockstein. No title insurance policy ever issued.
In the ensuing months Oxford became apprehensive. As a result of its persistent inquiry it was furnished a letter from Chicago bearing date of September 23, 1964, which read as follows:
"Please be advised that we have examined the lease made by American National Motor Inns, Inc. under the above numbered title policy and that from the language contained therein, this will certify that any mortgage put on the premises by American National Motor Inns, Inc. is a valid first lien on the premises without the necessity of any further acts on the part of the fee holder or American National Motor Inns, Inc. as lessee."
In the same vein, it sought and received from Tamburri the following letter under date of October 14, 1964:
*211 "After my examination of the Preliminary Title Report in the above matter, it is my opinion that the mortgage given by American National Motor Inns, Inc. to First National Credit Corporation is a first and valid lien on the premises therein described, subject to restrictive covenants recorded in Deed Book U70, Page 78, slope rights granted to the State of New Jersey by Deed Book A36, Page 392 and Deed Book C31, Page 262, slope rights of the Morris County Traction Company Deed Book V20, Page 47, and easements of brooks through p.q."
Oxford now claims that the respective letters from Chicago and Tamburri constituted warranties which have been breached. It is evident that there was no consideration in law for either of these letters. Oxford remained concerned throughout the summer of 1964 about the security for its loan and constantly sought further assurances, particularly from First National. Ultimately, as a result of this insistence and First National's effort to reassure Oxford, both the attorney for First National and the title company provided an expression of opinion in the form detailed above. Whatever motivated the respective letter writers in furnishing this gratuity, the essential element of consideration sufficient to support a contractual relationship from which an action for breach of warranty might flow was absent. Friedman v. Tappan Development Corporation, 22 N.J. 523 (1956). Oxford's claim in this regard is without merit. This being so, it is unnecessary to consider the defense of Tamburri that his letter was not in fact a guarantee, but merely a statement of opinion, the soundness of which was not warranted. See Sullivan v. Stout, 120 N.J.L. 304 (E. & A. 1938).
The complaint of Oxford that Chicago has breached its contract of insurance is also without merit.
A short answer to this claim is to be found in the express provision of the insuring agreement that such insurance as was afforded was "to be null and void unless title policy is issued by the undersigned in connection with said mortgage within nine (9) months from the date hereof and the premium thereon paid." No premium was ever paid. *212 No title policy issued. By the clear terms of the insurance contract, the responsibility of Chicago could be and was avoided by the failure of occurrence of these conditions subsequent.
Beyond this, the proposed insurance was against "loss or damage * * * which [Oxford] * * * may sustain by the failure of said First Certificate and Report on Title to correctly reflect the record title to the property herein described as of the date and hour thereof [June 25, 1964, 9:00 A.M.] * * *." The so-called first certificate and report on title clearly reflected ownership in Hockstein and the lease to American. There is no suggestion that the record title was not thereby "correctly reflect[ed]." In point of fact, the binder served to point up superior equities.
It is of no avail to Oxford to argue that irrespective of this phraseology, clear as it may be, the true purpose of the contract was to insure the priority of the mortgage mentioned therein. Insofar as this mortgage was concerned, the intentional act of striking out the words "Permanent loan" and leaving remaining the words "Construction loan" in the binder clearly signified only concern with a loan for construction purposes. As noted in the portion of this opinion dealing with the Chancery action, neither the First National loan to American nor the Oxford loan to First National was dedicated to this purpose.
Oxford's claim against Tamburri, however, must prevail. It delivered $46,000 to him upon the clear and express condition that the money should not be disbursed until certain conditions had been met. It expressly directed that there should be no disbursement unless all of the requirements were satisfied, required telephonic communication for further instructions in the event of noncompliance with any of its conditions, and precisely abnegated waiver without express authority. The import of its escrow letter of July 13, 1964 could not be clearer or more definitive. Despite this, at least two of the conditions were not satisfied: the mortgage was not executed by the title holder and a title insurance policy *213 with the required provision relating to priority of the mortgage was not secured. Tamburri did not telephone for further instructions, but instead disbursed the money. There was no waiver of the requirements.
Tamburri was bound by the terms of the deposit and is to be charged with the duties voluntarily assumed by him. "[T]he rule is that liability attaches to him if he improperly parts with his deposit." Cooper v. Bergton, 18 N.J. Super. 272, 277 (App. Div. 1952); 28 Am. Jur.2d, § 18, p. 27.
In the law action there will be judgment in favor of Chicago on Oxford's complaint, and in favor of Oxford and against Tamburri in the amount of $46,000 plus simple interest at 14% per annum, less credit in the amount of $5,437.86 previously paid.
NOTES
[*] While Cambridge Acceptance Corporation is the nominal plaintiff here, Oxford is the real party in interest. Cambridge and Oxford enjoy an identity of management and interest. There were assignments between the two, but they are of no legal significance. The parties have stipulated that the two companies may be treated for all purposes in this litigation as the same.