FOREST INC. OF KNOXVILLE,
Plaintiff-Appellant,

v.

GUARANTY MORTGAGE COMPANY,
INC., Defendant-Appellee.

Court of Appeals of Tennessee,
Eastern Section.

Oct. 23, 1975.

Certiorari Denied by Supreme Court
March 8, 1976.

W. Keith McCord, Knoxville, for plaintiff-appellant; Egerton, McAfee, Armistead, Davis & McCord, Knoxville, of counsel.

E. Bruce Foster, Ronald C. Koksal, Knoxville, for defendant-appellee; Frantz, McConnell & Seymour, Knoxville, of counsel.

## OPINION

DAVIS, Special Judge.

The parties will be referred to as they appeared in the trial Court, plaintiff and defendant, as indicated above.

By its complaint plaintiff avers defendant is indebted to it in the sum of $26,550.00, the sum of certain notes constituting the balance of the consideration for building lots it sold to Dean Cate, the notes being secured by Cate's deed of trust on said lots.

Plaintiff alleges there was an accepted practice custom and policy in the area that a land developer, such as plaintiff, sells lots to a contractor, such as Cate, who borrows money from a construction lender, such as defendant, to finance the construction of buildings on the lots; that the lender obtains a deed of trust from the contractor to secure its loan, which deed of trust is recorded prior to the developer's deed of trust, or failing in that, the lender takes a subordination agreement from the developer giving the construction lender a prior lien over the developer's deed of trust; that during the construction of the buildings the lender agrees to advance funds to the contractor at certain stages of construction in sums substantially on a ratio equal to the percentage of completion after the lender inspected the construction; that part of the custom was for the lender to inspect the construction, not over-advance funds to the contractor thereby protecting the interests of suppliers, materialmen, the developer and all having an interest, monetary in nature.

Plaintiff alleges that it did subordinate its indebtedness owed it by Cate to deeds of trust and notes of defendant so defendant would, and did, furnish construction funds to Cate. It asserts that defendant failed to properly inspect and supervise the construction, over-advanced funds to Cate before the buildings were completed, the funds were depleted to the point Cate could not finish the work, with the result, that defendant foreclosed under its deed of trust and kept the proceeds of the sale after advising plaintiff there were not enough funds to pay its subordinate notes in the sum of $26,550.00. It alleges it suffered the losses for which it sues because of defendant's action. Basically, as indicated in argument in open court on this appeal, the plaintiff asserts it is entitled to recover on contract, if not express, implied, that the consideration flowing from defendant to plaintiff was a duty of defendant to follow the custom existing in the industry in return for subordinating its security to that of defendant.

Pertinent parts of the defendant's answer include its denial of the existence of a practice or custom that construction lenders inspect the construction to protect the seller of the lots, the developer, but that such inspection was solely for its own protection, not for benefit of others with whom it had no contractual relationship. Defendant averred all loan commitments were made on basis of 75% of estimated cost of land and improvements when fully completed; that its absolute policy was not to accept any security less than a first mortgage except on rare occasions it might enter into a written agreement to pay some specifically designated obligation for a builder; denies the subordination agreement was executed for consideration of the assumption by defendant of any fiduciary relationship with plaintiff and denies any fiduciary relationship ever existed between them. Defendant asserts it did not inspect the construction for benefit of the plaintiff and had no duty to do so; that its commitment to Cate was based only on estimates of cost of completion of the houses, and for only 75% of the estimated cost of the land and completed houses, and it was never intended that defendant advance the total cost to Cate. Defendant denies it wrongfully advanced funds to Cate or indiscriminately disbursed funds to Cate or that its actions prevented Cate from finishing the work. Defendant admits Cate defaulted and that it foreclosed its mortgage after plaintiff refused defendant's tender of offer to permit plaintiff to complete the construction and thus minimize losses on plaintiff's mortgage; denies any action of defendant

caused plaintiff harm or damages or losses; denies it is obligated to plaintiff in any sum for any reason.

After a somewhat lengthy trial the trial judge held there was no contractual relationship established between the parties that would support a recovery; that no equitable relationship was shown justifying a recovery and that defendant did not estop itself from relying on plaintiff's subordination agreement. The plaintiff has appealed the dismissal of its action and assigned the following errors:

## ASSIGNMENTS OF ERROR

1. The Trial Court erred in ruling as a matter of law that the plaintiff could not recover from the defendant because there was no contractual relationship between defendant and plaintiff, notwithstanding the fact that the Trial Court found that there such a custom, practice and standard in the industry which had been violated by the defendant.

2. The Trial Court erred in ruling as a matter of law that the plaintiff could not recover from the defendant in equity because there was no equitable relationship between the parties and therefore "The custom of the trade which otherwise might control does not apply to their situation".

It appears that the evidence establishes the following facts;

In June 1972 there existed in the housing construction and development industry in the Knoxville area a custom and practice that land developers sell lots to a contractor or builder of dwellings, taking notes for unpaid portion of the purchase price secured by a deed of trust. The contractor would then borrow money from a construction lender, giving notes secured by deeds of trust, which deeds of trust were made a first lien on the property by the execution by the developer of a subordination agreement to that effect. It was part of the custom and practice of the industry that the construction lender not advance the construction loan to the contractor in substantially greater portions than the advancement bore to the stage of completion of construction at the time of the particular advancement of money. Advances would usually be made after periodic inspections of the construction work.

The foregoing stated custom and practice was one that varied some with different construction loan lenders, particularly as to the number and dates of inspection in relation to the stage of construction. It was a custom loose, general, but usually adhered to as compared to another practice or custom in the industry which was inflexible and strictly followed and understood by developers, builders and lenders alike. This latter practice and custom was that construction loan lenders never loaned any sum unless secured by a first mortgage or lien; that the party executing a subordination agreement did so with no qualifying conditions contained in it; that unquestionably such lender held the prior security. It was also generally believed, understood and accepted in the industry that the execution of an unconditional subordination agreement did not carry with it or create on the part of such lender any duty to protect the lot seller's interest, nor did it create a fiduciary obligation on the lender to the developer which in any manner equaled or excelled the lender's first duty and right to protect its own investment.

Plaintiff owned certain sub-division lots and sold at least nine of them to Dean Cate. It took notes, secured by deed of trust, for the unpaid portion of the purchase price. It was understood between them that plaintiff would subordinate its security or lien to one that Cate would give to a construction lender from whom he would borrow money to build dwellings on the property. Cate borrowed over $200,000.00 from defendant, giving his notes and securing their payment by deeds of trust dated June 8, 1972, the latter being recorded. The loan was for

75% of the estimated value of the lots and improvements when completed.

Thereafter, on June 18, 1972 plaintiff did execute an unqualified, unambiguous, unconditional subordination agreement which made defendant the holder of the first lien on said nine lots to secure defendant's loan to Cate. This was the first business transaction or dealing either party had had with the other and was consistent with the fact that such subordination agreements used in the industry did not have any limiting conditions, especially conditions governing how or when the money was to be disbursed to the borrower.

During the course of construction defendant made over-advances of money to Cate on nine occasions, a total of about $37,-000.00, that is, advances in excess of what the custom and practice indicated should have been made at the time.

It appears that plaintiff believed the defendant would disburse the advancements of construction loan money in accordance with existing custom as it understood it, but made no inspection of the property itself, made no request for inspections, and no inquiry about the status of money advancements to Cate.

It appears the primary reason for the over-advancements by defendant to Cate was it having confidence in his ability, integrity and experience to complete buildings, to give Cate a better opportunity to complete the houses in spite of the losses of material on the site stolen from Cate. Certainly there is no evidence that defendant's actions were intended to mislead or defraud anyone, nor that it thought that the result would inevitably be a loss suffered by plaintiff or others. Defendant apparently acted in this regard as business prudence would dictate, that is, try to protect its own interest, although it had no desire to further impair the financial interest of less secure creditors of Cate.

Whether Cate suffered so much loss of material on the site from theft, or the in-

crease of cost of materials and labor after he began construction, or the dramatic surge of inflation generally brought about his inability to complete the construction is difficult to say. There is no evidence he used the advanced money improperly. He did fail and it was necessary for the defendant to foreclose its first mortgage after plaintiff declined an opportunity to elect to assume or pay Cate's indebtedness to defendant and attempt to save itself by other means.

The two assignments of error and the principles of law and the facts are so closely related and intertwined that they will be considered together.

In *Morton v. Martin Aviation Corporation*, 205 Tenn. 41, 325 S.W.2d 524, it is said:

"Our authorities generally hold that usages or customs of trade, to be effectively binding in law, must be imperative and compulsory in character and so well known as to affect the person to be bound with knowledge of them and raise the presumption that be dealt with reference to them."

It appears to be settled in instances where a custom is not involved, or if existing is not binding, that advances of construction funds to a builder are in discharge of the lender's contract, and in absence of an express contractual provision to see to the application of the funds, there is neither an obligation nor a duty to do so for those creditors subordinate. *Kingsport Brick Corp. v. Bostwick*, 145 Tenn. 19, 235 S.W. 70.

We believe the custom as found to exist was not so imperative and compulsory as to be binding in law or to constitute a consideration for an implied contract, and that defendant owed plaintiff no duty to follow the custom in advancing funds.

Where a custom or usage is involved in the dealings between parties our

Supreme Court has said that a plaintiff basing his right to recover upon breach of contract cannot recover by proof of usage and no proof of contract, or proof of a custom and no proof of a contract. In discussing a contract the court pointed out the several essential elements of contracts, express and implied, among which were mentioned "a meeting of the minds in mutual assent to its terms . . . founded on sufficient consideration . . . and [be] sufficiently definite." *American Lead Pencil Co. v. Nashville, C. & St. L. Ry.*, 124 Tenn. 57, 134 S.W. 613.

We believe there was no meeting of the minds of the parties on a provision that the custom involved was a part of, or constituted consideration for any contract between them, express or implied; that the custom relied upon was not a part of any contract between the parties, express or implied; that defendant breached no contract with, or duty it owed to plaintiff; that defendants primary intention in its dealings with Cate was to do that which would best insure a successful completion of the buildings and their sale; that defendant exercised any and all care required of it in connection with the custom of the industry consistent with the right, reasonably exercised, to protect its own large investment.

We here quote rather extensively from the opinion of the learned Chancellor who tried this case.

"In these circumstances it must be determined what effect the custom and practice of paying in proportion to complete construction has. Plaintiff cites the following cases in support of its position: *Housing Mortgage Corp. v. Allied Constr. Inc.* (1953) 374 Pa. 312, 97 A.2d 802; *Cambridge Acceptance Corp. v. American National Motor Ins. Inc., et al.* (1967) 96 N.J.Super. 183, 232 A.2d 692; *Cambridge Acceptance Corp. v. Leo Hockstein et al.* (1968) 102 N.J.Super. 435, 246 A.2d 128 [138]; *Miller v. Citizens and Loan Association* (1967) [248] Cal.App. [2d 655], 56 Cal.Rptr. 844; *Middlebrook-An-*

*derson Co. v. Southwest Savings and Loan Association* (1971) 18 Cal.App.3d 1023, 96 Cal.Rptr. 338. It appears from these cases that where there is an agreement or stipulation for the construction lender to supervise disbursement of funds it must do so in accord with that agreement or stipulation. Such an agreement has been found in various circumstances where the subordinating vendor and the construction lender have had dealings together in connection with the involved project. However, where the proofs do not establish some sort of dealings between the vendor and lender there appears to be no obligation from the lender to vendor with respect to advancement of constructions. This view is clearly expressed in the *Hockstein* case, supra, where the Court said:

"Yet it is the general view, recognized by respectable authority, that absent an express stipulation between the subordinator and the construction lender conditioning the scope of the subordination, diversion of the construction money by the borrower from its contemplated use will not dislodge the advanced lienor from his bargained-for priority 'in the absence of collusion with the mortgagor in diverting the money from its purpose.' IV American Law of Property, § 16.106D, p. 218 (1952; A. James Casner, Editor); 1 Jones on Mortgages, § 742, p. 1105 (1928); Note, 42 Yale L.J. 980, 982 (1933); *Brooklyn Trust Co. v. Fairfield Gardens*, 260 N.Y. 16, 182 N.E. 231 (Ct.App.1932); *Gill v. Mission Savings & Loan Association*, 236 Cal.App.2d 753, 46 Cal.Rptr. 456 (D.Ct.App.1965); *Matthews v. Hinton*, 234 Cal.App.2d 736, 44 Cal.Rptr. 692, 697 (D.Ct.App.1965); *Iowa Loan & Trust Co. v. Plewe*, 202 Iowa 79, 209 N.W. 399 (Sup.Ct.1926), commented on in 12 Iowa L.Rev. 201, 203 (1927); *Anglo-American Savings & Loan Association v. Campbell*, 13 App.D.C. 581, 43 L.R.A. 622 (1898).

Where, however, the construction mortgage expressly agrees with the subordinator to see to it that the proceeds of his

loan will be applied to construction of the improvement he will be held to his agreement and will lose his priority as to any advance not going into the construction. *Albert & Kernahan v. Franklin Arms*, 104 N.J.Eq. 446, 146 A. 213 (E. & A.1929); *Joralman v. McPhee*, 31 Colo. 26, 71 P. 419 (Sup.Ct.1903); see *Wayne International Building & Loan Association v. Moats*, 149 Ind. 123, 48 N.E. 793 (Sup.Ct. 1897)."

Notwithstanding, its conclusion that there was no express agreement the Court in the *Hockstein* case decided on equitable principles that the lender had an obligation to see that construction funds went into the intended construction. The Court said:

"While, under general principles of mortgage subordination law outlined above, a construction lender taking the benefit of a subordination is not a guarantor to the subordinator or liable to him for mere negligence in seeing to the appropriation of the moneys to the construction, we think plain principles of equity at least call for such a construction lender to make and administer the loan in the conventional manner of a construction lender rather than mask what is essentially a loan on the general credit and reliability of the borrower and the security of the land value as a construction loan, and act accordingly in disbursing the funds. We are firm in the conclusion, and so find, that the latter is what the First National did here, and in violation of the owner's equitable rights."

In the *Hockstein* case First National, the lender, made no effort at all to administer its loan as a construction loan, and there was virtually no attempt at all to see that the loan funds advanced went into the construction. Under these circumstances the Court held the lender equitably estopped to assert the subordination.

Whether the theory be contractual in nature or equitable, the cases recognizing or holding that the lender cannot take advantage of the land seller's subordination have involved situations where there has been some sort of dealings between the lender and land seller. If the basis is contractual, the lender must be shown to have agreed in some manner to the subordination in connection with a construction contract under circumstances which permit a finding that the lender was obligated to supervise loan distribution. If the basis is equitable, the parties must be shown to have engaged in some dealings in circumstances wherein the lender led the subordinating seller to believe the lender would advance loan proceeds in a manner contrary to that which later happened.

Here Plaintiff relies on a custom of the trade with respect to loan advances which has been found to exist. However, a custom of the kind here involved does not itself create a contract or an equitable relationship. A custom of the trade explains or gives meaning to dealings between parties. Generally, where there have been no dealings between the parties, a contractual or equitable obligation cannot arise and in such circumstances there is no legal relationship to which a custom or useage may apply. Thus the Supreme Court said in *American Lead Pencil Co. v. Nashville, C. & St. L. Ry.* (1911) 124 Tenn. 57, 134 S.W. 613:

"We cannot bring ourselves to the conclusion that a bill, which bases the complainant's rights to recover upon the breach of a contract, can be sustained by proof of a usage and no proof of a contract, or proof of a custom and no proof of a contract."

In this case it has not been shown that the parties had any dealings from which an agreement might be found. About all that happened was that Plaintiff subordinated its security to Defendants' interest. There was no showing of any further dealings between the parties. Thus there was no contractual arrangement to form a basis for Plaintiff's claim. Similarly, Defendant was not shown to have dealt with Plaintiff in

such a manner as to affirmatively mislead Plaintiff as to the manner in which it would disburse loan funds. In the *Hockstein* case the parties took part in establishing the financing arrangements and then the lender totally failed to see that the loan funds went into the construction as to which the seller subordinated. In the present case the Defendant advanced funds as construction proceeded, apparently believing they were going into the construction. The proofs do not establish that the funds did not go into the construction, merely that they were advanced too soon. It may be that some funds were not used in homes, but as far as the proofs are concerned this is not established. It may be that escalating labor and material costs made the funds advanced inadequate to pay for all the costs of construction. The proofs do not show a mispayment or diversion of funds by Defendant that were contrary to anything Defendant may have represented to Plaintiff. Defendant did nothing to equitably estop itself from relying on Plaintiff's subordination document. Thus, Defendant not having dealt with Plaintiff so as to establish a contractual or equitable relationship between the parties, the custom of the trade which otherwise might control does not apply to their situation. It is concluded that Plaintiff may not recover against Defendant."

The assignments of error are overruled, the judgment of the Trial Court is affirmed. Plaintiff-appellant is taxed with cost of the cause.

SANDERS, J., and LUKE M. McAMIS, Special Judge, concur.