953 F.2d 1384
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
CONGLOMERATED HOSTS, LTD., Appellant,
v.
JEPCO, INC., Appellee.
 No. 91-5182.
 United States Court of Appeals, Sixth Circuit.
 Feb. 5, 1992.
 
 Before MILBURN and RALPH B. GUY, Jr., Circuit Judges, and GRAHAM, District Judge.*
 OPINION
 PER CURIAM.
 
 
 1
 Plaintiff appellant, Conglomerated Hosts, Ltd. ("Conglomerated") operates and licenses Provino's Italian Restaurants. Conglomerated built a Provino's for defendant appellee, Jepco, Inc. ("Jepco"). Jepco initially paid Conglomerated 4 1/2% of its gross sales, but about eleven months after opening, Jepco changed the name of the restaurant from Provino's to Altruda's, and terminated whatever relationship it had with Conglomerated. Conglomerated brought suit against Jepco in district court, asserting claims under the Lanham Act and various state common law theories. The district court dismissed all of Conglomerated's claims after a trial to the court. On appeal, Conglomerated asserts that the district court erred by holding: that Conglomerated failed to prove a likelihood of consumer confusion; that Jepco was not unjustly enriched; and that no implied-in-fact contract existed between the parties. For the following reasons, we affirm the judgment of the district court.
 
 I.
 
 2
 Conglomerated operates and licenses Provino's Italian Restaurants in Atlanta, South Carolina and Chattanooga, Tennessee. In September 1986 Paul Meyer and his father-in-law, John Blevins, met with the president and founder of Provino's, John Bogino, about building a Provino's to be operated by Paul Meyer. At that meeting, some of the terms of a proposed franchise agreement were agreed upon: (1) that Conglomerated would build a Provino's Italian Restaurant in Knoxville, Tennessee, costs to be charged to Jepco, Inc., a corporation created by Blevins and Meyer; and (2) that once the restaurant was operating, Jepco would pay Conglomerated 4 1/2% of its gross monthly sales as a franchise fee. The estimated cost of constructing the restaurant was $225,000.
 
 
 3
 Conglomerated's attorney drafted a proposed franchise agreement. Both John and Sarah Blevins testified that they did not see a copy of the proposed franchise agreement until after the instant litigation was commenced. Bogino stated that he sent a copy of the proposed franchise agreement to John Blevins, intending to discuss it with him at some time in the future. Bogino testified as follows regarding his intent to arrive at an agreement with Blevins in the future:
 
 
 4
 Q. You were going to sit down with Mr. Blevins and get an agreement in the future?
 
 
 5
 A. This was drafted in September of '87 and yes, after, at sometime after I received this copy he and I would sit down and hammer out an agreement. Yes, that is correct, sometime in the future.
 
 
 6
 (Tr. pp. 153-54). It is not disputed that Bogino and Blevins never sat down to hammer out an agreement. Nor is it disputed that a written franchise agreement was never executed. As a result, the parties never expressly agreed upon all of the terms of the proposed franchise agreement. In particular, the parties never agreed on how long the proposed agreement would be in effect, and Conglomerated's on-going duties under the agreement.
 
 
 7
 Conglomerated built the Knoxville Provino's in the fall of 1987. Jepco, as agreed, paid for the construction, which ultimately cost $240,000. This amount included a 10% administrative fee added by Conglomerated, which Jepco paid without objection. Conglomerated also negotiated a seven-year lease for Jepco. The lease provided for two five-year options. The lease does not refer to any franchise agreement. John Bogino also contacted American Express on behalf of Jepco and obtained a more favorable rate for Jepco, 3.2% rather than the usual 4.7%.
 
 
 8
 The Knoxville Provino's opened in January 1988. Conglomerated sent its own personnel to Knoxville to train staff and to help open the restaurant, but Jepco paid their wages and expenses. Jepco paid Conglomerated 4 1/2% of its gross sales for the first ten months of the restaurant's operation.
 
 
 9
 Paul Meyer testified that on many occasions he attempted without success to contact John Bogino by telephone about problems he was experiencing running the restaurant. On March 3, 1988 John Bogino sent a letter to John Blevins explaining how to calculate the 4.5% franchise fee. At the end of the letter, Bogino stated: "If there are any questions or information that you might have, please include them along with the items that are due by the 15th." Conglomerated contends that this language means that all complaints or requests for assistance were to have been submitted in writing with the monthly fees. Eric Meyer, the brother of Paul Meyer and an employee of Conglomerated, testified that in the summer of 1988 he talked with John Bogino about the fact that no one was returning Paul Meyer's calls. Eric Meyer further testified that Bogino's response was that he would call Paul Meyer when he was "good and ready." The matters Paul Meyer sought to discuss with Bogino included the need to add mixed drinks to the menu and the need to replace menus that had worn out. Paul Meyer testified that he received "many many many" complaints from customers about the fact that the restaurant did not serve mixed drinks. He also testified that the new menus cost Jepco $1,276.51 to print. The record tends to show that Conglomerated actively assisted its franchisees who operated other Provino's.
 
 
 10
 On December 12, 1988 Attorney Robert Crawford sent a letter on behalf of Jepco to John Bogino, informing Bogino that Jepco was terminating any existing relationship with Conglomerated effective December 21, 1988, and that, as far as Jepco was concerned, although negotiations regarding a franchise agreement had been conducted, no franchise agreement was ever reached. On December 21, 1988, the name of the Knoxville restaurant was changed to "Altruda's." The parties sharply disagree about what happened next. Relevant to its trade dress claim, Conglomerated asserts that little about the restaurant changed after it became Altruda's on December 21, 1988. Conglomerated asserts that the appearance of the front of the restaurant remained the same, including menu boards and an antique door of the same type used at Provino's restaurants. Conglomerated also asserts that Altruda's serves the same type of food, using Provino's recipes, and serves the food in the same manner in similar portions and at the same prices as Provino's. Conglomerated maintains that the only interior changes Jepco made to the restaurant were to change the color of the curtains and tablecloths from green to burgundy, and to convert one of the dining rooms into a bar.
 
 
 11
 Conglomerated contends that the following items constituted Provino's distinctive trade dress, and that these items were used by Jepco in its Altruda's restaurant:
 
 
 12
 1. A dining area divided into separate rooms.
 
 
 13
 2. A library room with books.
 
 
 14
 3. Stained glass windows.
 
 
 15
 4. Ivy-covered trellises.
 
 
 16
 5. A non-functional display case in the restaurant lobby.
 
 
 17
 6. A non-functional old-fashioned cash register in the lobby.
 
 
 18
 7. A menu board outside the restaurant.
 
 
 19
 8. A fireplace inside the restaurant constructed so that the mortar had seeped out from between the stones.
 
 
 20
 Conglomerated also argues that the names "Provino's" and "Altruda's" are similar.
 
 
 21
 Jepco, on the other hand, points out the numerous changes it made to the restaurant. Sarah Blevins testified that the menu board outside the restaurant was completely changed. She also testified that with the help of Paul Meyer and Greg Fisher, she created a new menu for Altruda's derived in part from about eighteen Italian menus featured in "Cuisine Atlanta" magazine. According to Greg Fisher, the head cook for Altruda's, all of Altruda's recipes are different from Provino's recipes with the exception of the recipe for bread dough. Sarah Blevins testified that Provino's recipe for bread dough uses exactly the same ingredients as a recipe for pizza dough found in a 1971 cookbook.
 
 
 22
 Other changes Jepco asserts it made include: running "specials," daily variations of the seating chart, redecorating the lobby, removing items placed in the lobby by Conglomerated and replacing them with a non-functional bar, thereby increasing waiting space, removing the dessert counter from the lobby, changing the lighting from yellow to white, changing the wine glasses, tablecloths, and removing decorative umbrellas, placing a full-service bar in one of the former dining rooms, accepting reservations (which Provino's did not do), increasing the number of credit cards accepted at the restaurant, opening for lunch, and adding a wine list. Before December 21, 1988 Jepco had printed new menus, added new wine selections, purchased and used highchairs and added milk to the menu. Regarding the names of the restaurants, Jepco points out that many Italian restaurants have similar-sounding names. Paul Meyer's mother's maiden name was Altruda; John Bogino's father's name was Provino.
 
 
 23
 Conglomerated filed its complaint in the district court on May 8, 1989, asserting against Jepco claims of breach of express and implied contract, quantum meruit, theft of trade secrets, deceptive trade practices and unjust enrichment. Jepco counterclaimed for breach of contract. The matter proceeded to trial before the court without a jury on December 4 through 6, 1990. On January 8, 1991 the trial court issued an order dismissing all of the parties' claims, and issued a memorandum opinion setting forth the court's findings of fact and conclusions of law. The district court dismissed Conglomerated's breach of express contract claim on the basis that the purported express contract was not sufficiently definite because it did not specify the length of the contract and did not enumerate Conglomerated's on-going duties. The district court also concluded that the alleged contract did not, in any event, satisfy the statute of frauds. The district court dismissed Conglomerated's breach of implied contract claim, concluding that the circumstances warranted an inference that negotiations took place rather than the actual creation of a contract. The district court found that Conglomerated was compensated for all of the work it did and that Conglomerated was partially responsible for the breakdown of the proposed franchise relationship. For these reasons the district court dismissed Conglomerated's quantum meruit and unjust enrichment claims. The district court dismissed Conglomerated's theft of trade secrets claim for lack of evidence that the subject Provino's recipes were secret.
 
 
 24
 The district court dismissed Conglomerated's deceptive trade practices claim on the basis that Conglomerated failed to prove that there was a likelihood of consumer confusion as to the source of Jepco's services. Although recognizing that it was not conclusive, the district court noted that there was no evidence of actual consumer confusion. The district court found that there was no proof regarding the strength of Conglomerated's mark in the Knoxville, Tennessee area. Lastly, the district court found that the parties' marks were not similar and that there were significant differences between the restaurants' decor.
 
 II.
 
 25
 The first issue presented is whether the district court erred in finding that Conglomerated failed to prove a likelihood of consumer confusion for the purpose of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Whether a likelihood of confusion exists under § 43(a) presents a mixed question of law and fact. Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1186 (6th Cir.1988). The clearly erroneous standard is applicable to the district court's findings of fact supporting the likelihood of confusion factors; the question whether the facts constitute a likelihood of confusion is reviewed de novo. Id.
 
 
 26
 The parties agree that the district court applied the correct standard for determining likelihood of confusion, the eight-part test set forth in Frisch's Restaurants v. Elby's Big Boy, Inc., 670 F.2d 642 (6th Cir.1982):
 
 
 27
 1. strength of plaintiff's mark;
 
 
 28
 2. relatedness of the goods;
 
 
 29
 3. similarity of the marks;
 
 
 30
 4. evidence of actual confusion;
 
 
 31
 5. marketing channels used;
 
 
 32
 6. likely degree of purchaser care;
 
 
 33
 7. defendant's intent in selecting the mark;
 
 
 34
 8. likelihood of expansion of the product lines.
 
 
 35
 Id. at 648. These factors are merely a guide to assist in the determination whether confusion is likely; mathematical precision is not intended. Homeowners Group v. Home Marketing Specialists, 931 F.2d 1100, 1107 (6th Cir.1991). A plaintiff need not show that all, or even most of the factors are present in order to prevail. Wynn, 839 F.2d at 1186. "The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." Homeowners Group, 931 F.2d at 1107.
 
 
 36
 The district court's findings on the individual factors are supported by the record and are not clearly erroneous. There was no proof regarding the strength of Conglomerated's mark in the Knoxville, Tennessee area. The record reveals significant differences between the restaurants' decor. The names "Provino's" and "Altruda's" are not similar. There was no evidence of actual consumer confusion. Based upon these findings, the district court correctly concluded that Conglomerated failed to prove a likelihood of consumer confusion.
 
 III.
 
 37
 The second issue presented is whether the district court erred in holding that Jepco was not unjustly enriched by the services provided by Conglomerated. Conglomerated argues that although it was compensated for the actual construction of the Knoxville restaurant, it performed valuable services for Jepco other than the construction. Jepco maintains that the price of the construction and the $26,000 it paid Conglomerated over the first ten months as 4 1/2% of its gross sales was sufficient compensation for any services Conglomerated may have provided, and that Conglomerated did not provide it with any on-going services in return for the 4 1/2% fee. The district court found that Conglomerated was compensated for all of the work it did and that by its own conduct Conglomerated was partially responsible for the breakdown of the contemplated franchise relationship.
 
 
 38
 Conglomerated refers to its claim variously as one of unjust enrichment, quantum meruit, or implied-in-law contract. These terms are interchangeable under Tennessee law. Paschall's, Inc. v. Dozier, 219 Tenn. 45, 57, 407 S.W.2d 150, 154 (1966). All of these theories are founded upon the principle "that a party receiving a benefit desired by him, under circumstances rendering it inequitable to retain it without making compensation, must do so." Id.
 
 
 39
 The district court's finding that Conglomerated was compensated for all of the work it did was not clearly erroneous. It is not disputed that Conglomerated was fully compensated for the construction of the restaurant. The 4 1/2% fee Jepco paid Conglomerated for ten months was just compensation for the few services Conglomerated provided other than the construction of the restaurant, such as participating in the negotiation of the lease and arranging for Jepco to receive a more favorable rate from American Express.
 
 
 40
 The district court's conclusion that Conglomerated was partially responsible for the breakdown of the parties' relationship is also supported by the record. There is no evidence that Conglomerated provided any services to Jepco after the restaurant became fully operational. Most significantly, however, Conglomerated never responded to Jepco's specific requests for assistance. Conglomerated's excuse for not responding is that it sent a letter to Jepco on March 3, 1988 that contained a requirement that all complaints or requests for assistance were to have been submitted in writing with the monthly fees. The operative language of the letter is: "If there are any questions or information that you might have, please include them along with the items that are due by the 15th." This language cannot reasonably be construed to create an agreed rule of conduct between the parties whereby Jepco agreed to submit all requests for assistance in writing, and was prohibited from seeking assistance by telephone.
 
 
 41
 For the foregoing reasons, the district court did not err in concluding that Jepco was not unjustly enriched.
 
 IV.
 
 42
 Conglomerated next argues that the district court erred in determining that an implied-in-fact contract did not exist between the parties. Conglomerated contends that a meeting of the minds occurred as to all of the essential elements of the alleged franchise agreement. Jepco maintains that the parties at most had an agreement to agree at some later date, but that an actual contract was never formed.
 
 
 43
 The district court made findings that are relevant to whether an express or an implied-in-fact contract existed between the parties. The district court found that the parties never reached an agreement as to two essential elements: the length of the contract; and what Conglomerated's on-going duties under the contract would be. As to the element of length, the district court addressed and rejected Conglomerated's argument that the length of the franchise agreement could be inferred from the length of the lease. The district court determined that it would be mere speculation for the court to fix the term of the purported franchise agreement by the length of the lease because, taking the options into account, the length of the lease could be seven, twelve, or seventeen years. With regard to enforceability, the district court concluded that it would be impossible to tell whether Bogino's failure to return Meyer's calls would constitute a breach under the supposed franchise agreement. The district court found that the circumstances did not warrant a finding of an implied-in-fact contract. The "circumstances" included the parties' failure to advance beyond negotiations, and, presumably, their failure to reach an agreement as to the previously discussed essential terms.
 
 
 44
 "An implied-in-fact contract is one that is 'founded upon a meeting of minds which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.' " Parker v. Department of Health, Education, and Welfare, 478 F.Supp. 1156, 1160 (M.D.Tenn.1979) (quoting Baltimore & Ohio R.R. Co. v. United States, 261 U.S. 592, 597 (1923)). Hence, the distinctive feature of an implied in fact contract is that it is implied from conduct and circumstances; aside from this there is no difference between an express contract and an implied contract. Restatement (Second) of Contracts § 4, cmt. a (1979). The essential elements of an implied contract include a meeting of the minds, mutual assent to its terms, sufficient consideration and sufficient definiteness. Forrest, Inc. v. Guaranty Manufacturing Co., 534 S.W.2d 853, 857 (Tenn.App.1975).
 
 
 45
 The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
 
 
 46
 Restatement (Second) of Contracts § 33(2) (1979). Likewise, under Tennessee law, in order to be binding, a contract, express or implied, must be sufficiently definite to render it enforceable. Higgins v. Oil, Chemical and Atomic Workers International Union, Local # 3-677, 811 S.W.2d 875, 879 (Tenn.1991). A purported contract may fail for lack of sufficient definiteness where the parties have failed to agree upon the length of time payments must be made by one party. Id. " 'It is fundamental that for a contract to be enforceable it must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties.' " Id. at 880 (quoting Soar v. National Football League Players' Assn., 550 F.2d 1287, 1289-90 (1st Cir.1977)). "A contract to make a contract is unenforceable because essential terms are left to future agreement." Local 3-7 International Woodworkers of America v. Daw Forest Products Co., 833 F.2d 789, 793 (9th Cir.1987) (citing 1A Corbin, Corbin on Contracts, § 29 (1963)).
 
 
 47
 The district court did not err in determining that an implied-in-fact contract did not exist between the parties. First, there is nothing in the record to suggest that the parties intended the length of the purported franchise agreement to be fixed by the length of the lease. Moreover, as the district court observed, the lease itself, because it includes two options, provides three possible lengths. Choosing among these three alternatives would be arbitrary and speculative. Furthermore, Bogino's own testimony supports the district court's finding that the parties, in essence, undertook negotiations and agreed to reach an agreement at some time in the future. (Tr. pp. 153-54).
 
 
 48
 Most importantly, there are no facts or circumstances in this case from which to infer what Conglomerated's on-going duties under the contract would be. For example, as the district court noted, it would be impossible to determine whether Bogino's failure to respond to Meyer's requests for assistance would constitute a breach of any implied-in-fact contract. It would be manifestly unfair to impose an on-going duty on Jepco to continue to pay franchise fees where it is impossible to tell what corresponding on-going duties Conglomerated would have. In light of the foregoing, the district court properly concluded that an implied-in-fact contract did not exist between the parties.
 
 
 49
 Based on the foregoing, the decision of the district court is AFFIRMED.
 
 
 
 *
 The Honorable James L. Graham, United States District Court for the Southern District of Ohio, sitting by designation