# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 29, 2001 Session

## ROUSE CONSTRUCTION COMPANY v. INTERSTATE STEEL CORPORATION

**Appeal from the Chancery Court for Knox County**
**No. 137689-3     Sharon Bell, Chancellor**

**FILED JANUARY 15, 2002**

**No. E2001-00242-COA-R3-CV**

---

This is a case wherein the Plaintiff/Appellant, Rouse Construction Company, seeks damages for breach of contract from the Defendant/Appellee, Interstate Steel Corporation. The Chancellor found that there was no meeting of minds between the parties as to essential contract terms and, therefore, ordered that Rouse's claim be denied. The Chancellor further determined that Interstate should be allowed a judgment in the amount of $19,090.00 for materials and plans delivered to Rouse. We concur in the determination of the Chancellor and affirm.

**Tenn.R.App.P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and CHARLES D. SUSANO, JR., JJ., joined.

D. Scott Hurley, Knoxville, Tennessee, for the Plaintiff/Appellant, Rouse Construction Company

Wanda Graham Sobieski and Nanette J. Landen, Knoxville, Tennessee, for the Defendant/Appellee, Interstate Steel Corporation

## OPINION

In this appeal from the Knox County Chancery Court the Plaintiff/Appellant, Rouse Construction Company (hereinafter Rouse), contests the ruling of the Knox County Chancery Court in favor of the Defendant/Appellee, Interstate Steel Corporation (hereinafter Interstate) and raises the following issues which we restate:

1. Did the Chancellor err in her determination that there was no meeting of the minds between the parties with respect to essential terms of a construction subcontract which Rouse asserts existed between itself and Interstate?

2. Did the Chancellor err in granting Interstate a judgment for materials and construction plans which Interstate provided to Rouse in connection with a construction project for which Rouse was employed as general contractor?

In August of 1997, Interstate submitted a bid to Rouse to be employed as a subcontractor to provide steel fabrication and erection for a construction project for Grace Baptist Church in Knoxville. Rouse relied on this bid in calculating its own bid to be employed as general contractor on the project.

In late September of 1997, Grace Baptist Church advised Rouse that it had been chosen to serve as general contractor and on or around that same date Rouse notified Interstate that it planned to use Interstate for structural steel fabrication and erection based on Interstate's apparent low bid to perform those services. Shortly thereafter, Interstate began providing some services to the project, transmitting a few framing plans and bolts to the construction site on October 3, 1997, and some erection drawings, nuts, bolts and washers on October 7, 1997.

On October 15, 1997, Dwight Campbell, Rouse's project expediter, sent a fax to Interstate's president, John Goodwin, setting forth a proposed schedule of tentative start dates for steel work by Interstate. However, at a meeting on October 17, 1997, between Mr. Goodwin and Rouse officials, Mr. Goodwin announced that Interstate would not be able to comply with this schedule and presented Rouse with an alternative schedule. Rouse officials testify that the schedule presented by Mr. Goodwin was not separated into construction phases and was rejected. Mr. Goodwin was asked by Rouse to submit a phased schedule with a bar graph showing how each phase of construction would be implemented in relation to the building. It is undisputed that, at the time of the meeting on October 17 there was still no signed contract between the parties.

On October 20, 1997, Joel Perfetto, vice president of Rouse, received a bar graph schedule from Interstate along with a cover memorandum from Mr. Goodwin describing the attached schedule as 'tentative' and noting that, although the attached schedule breaks framing into two sequences, a three unit break would, in his opinion, make the project easier. Mr. Perfetto testifies that he contacted Mr. Goodwin upon receipt of this proposed schedule and memorandum and requested that Mr. Goodwin submit a three phase schedule but that Mr. Goodwin never did so. Mr. Goodwin testifies that Rouse did not respond to the schedule submitted by him on October 20.

The next meeting between Rouse and Interstate took place on November 14, 1997. Mr. Goodwin testifies that at this meeting Mr. Perfetto presented him with yet another schedule which Mr. Goodwin rejected and he describes the dates set forth in that schedule as "somewhat similar, if not tighter, than the one that Dwight Campbell told me was their tentative start up dates. It did not reflect the schedule I gave them on the 20th of October." Mr. Goodwin further testifies that at this meeting he was advised by Rouse that a contract was still being worked on but that it would be finalized by the next week. Pending readiness of the contract, Rouse provided Mr. Goodwin with a sample form contract for his review.

On November 18, 1997, Mr. Goodwin sent a letter to Doug Donohue, president of Rouse, which Mr. Goodwin testifies was prompted by a phone call from Mr. Donohue the previous day wherein Mr. Donohue indicated that Interstate was behind schedule in submission of shop drawings. Mr. Goodwin begins this letter by stating as follows:

> In view of the circumstances and your schedule demands, I do not believe we can help you in this project.
>
> We have gone over all aspects of this matter very carefully, and still must contend that the very best we can do, as far as schedule is concerned, does not meet your needs.

The letter also describes the best that Interstate is able to do with respect to scheduling, setting forth those factors upon which such scheduling would be contingent. In closing the letter, Mr. Goodwin states:

> If this project schedule becomes more realistic, perhaps we can work with you to the extent as stated above.
>
> Please advise me as soon as possible as we are continuing our efforts and progress on the framing plan portion of this project.

On the day after he received this letter Mr. Donohue called Mr. Goodwin and, according to Mr. Goodwin, inquired as to when Interstate would be able to submit shop drawings for the project. Mr. Goodwin testifies that he advised Mr. Donohue that he would be able to submit the drawings as soon as certain problems were resolved on framing plans. Mr. Goodwin further testifies that this telephone call "eased Dave Donohue's mind in the fact that we were still working on our plans."

The record shows that Interstate continued working on the project during the months of November and December of 1997, specifically by preparing framing plans and shipping bolts, steel beams and steel columns to the construction site. The record also shows that the parties corresponded on various occasions during this time period regarding delivery of materials and other matters related to work being performed on the project by Interstate.

On December 30, 1997, Rouse sent Interstate a proposed contract for execution which included a liquidated damages clause pursuant to which Interstate "shall furnish in good time sufficient labor, materials, plant[1] and equipment and shall work such hours as may be necessary to insure substantial completion of the work in accordance with the agreed upon construction schedule." The liquidated damages clause further states that "The Subcontractor shall be liable for any damages, actual or liquidated, which the Owner may sustain as a result of failure or delay by the Subcontractor without reasonable cause in the performance of the work and in adhering to the prerequisite requirements to substantial completion." The Parties had not previously discussed

---

[1]We assume that this word should be 'plans' rather than 'plant'.

liquidated damages and the clause does not set forth a per day liability limitation amount. Interstate asserts that, because of the exposure it would face under this liquidated damages clause and the fact that there had been no agreement reached between it and Rouse as to a schedule, it did not sign the contract.

Rouse officials next met with Mr. Goodwin on January 14, 1998. Mr. Donohue testifies that he brought to this meeting a project schedule that had been prepared in November of 1997 for submission to Grace Baptist Church. Our review of this schedule reveals that it is a general schedule which covers, not only the steel work that Interstate would have performed, but also other work necessary to completion of the project such as masonry and carpentry. Mr. Donohue testifies that Interstate did not agree to this schedule. Mr. Goodwin testifies that, prior to litigation of this case, he had not seen this schedule and that, in fact, the schedule which Mr. Donohue furnished him on January 14, 1998, was the same schedule he had received from Mr. Perfetto on November 14, 1997. In any event, there was no agreement as to either of these schedules at the meeting on January 14, 1998, nor does it appear that there was any discussion of the proposed contract Interstate had received from Rouse on January 3. Rouse asserts that at this meeting Interstate agreed to deliver steel for the first phase or sequence of the project by the end of January; however, Interstate denies this.

On February 10, 1998, Rouse faxed Mr. Goodwin a message requesting that he furnish steel delivery dates for the project. The next day , February 11, 1998, Mr. Goodwin wrote a letter advising Rouse that, because there had been no meeting of the minds between the Parties as to the project schedule and because the contract proposed by Rouse contained unacceptable terms, including the liquidated damages clause, Interstate had no alternative but to reject the proposed contract. The letter also requests that Rouse return Interstate's shop drawings and a subsequent letter dated April 23, 1998, Interstate requests that Rouse pay for steel delivered and used on the project.

On March 6, 1998, Rouse filed a complaint against Interstate seeking damages for breach of contract, negligence and negligent misrepresentation. The case came on for trial on July 8, 1999, and, based upon her factual findings, the Chancellor concluded that there had not been a meeting of minds between Rouse and Interstate as to essential contract terms of scheduling and liquidated damages. Accordingly, Rouse's claim for breach of contract was denied and Interstate was granted a judgment against Rouse in the amount of $19,090.00 for construction plans and material delivered to Rouse while Interstate was working on the project. Rouse filed its notice of appeal on January 31, 2001.

This is a non-jury case and, as such, our review is *de novo* upon the record of the proceedings below. There is no presumption as to the correctness of the trial court's conclusions of law. See *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26 (Tenn. 1996). However, as mandated by Tenn.R.App.P. 13(d), there is a presumption that the trial court's findings of fact are correct and we must honor that presumption unless the evidence preponderates to the contrary. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87 (Tenn. 1993). Further, this Court does not pass judgment on the credibility of witnesses. The trial court, having seen and heard the witnesses testify, is in the best position to determine the witnesses' credibility. See *Bowman v. Bowman*, 836 S.W.2d 563 (Tenn. Ct. App. 1991).

It is well established under the law in Tennessee and elsewhere that a contract requires a meeting of minds as to terms and that indefiniteness as to an essential element of a contract may prevent the creation of an enforceable contract. See *Doe v. HCA Health Services of Tennessee, Inc.* 46 S.W.3d 191 (Tenn. 2001). The requirement that there be a meeting of minds as to the terms of the contract applies whether the contract is express or implied. See *Forest, Inc. of Knoxville v. Guaranty Mortgage Company, Inc.* 534 S.W.2d 853 (Tenn. Ct. App. 1975).

Rouse does not dispute that scheduling was an essential element of contract in this case and the proposed contract received by Interstate from Rouse on January 3, 1998, specifically states:

> Time is of the essence in this Agreement. The Subcontractor shall furnish in good time sufficient labor, materials, plant[2] and equipment and shall work such hours as may be necessary to insure substantial completion of the work in accordance with the *agreed upon construction schedule*.(italics added)

Rouse contends that, while the parties have diverging views about what was discussed or agreed to as far as scheduling was concerned, the schedule submitted by Mr. Goodwin to Mr. Perfetto on October 20, 1997, was, in fact, the schedule upon which the Parties agreed and upon which there was a meeting of minds. And, while there was no express written contract between the Parties in this case, Rouse contends that there was, nevertheless, an implied contract as evidenced by the submission of a bid by Interstate, the awarding of that bid by Rouse, the acceptance of that award by Interstate and the commencement of work on the project by Interstate. We respectfully disagree with Rouse that there was a meeting of minds between the Parties as to scheduling and we further disagree that the conduct of the parties supports a finding of implied contract.

The schedule of October 20, 1997, is specifically designated a "tentative schedule" in the memorandum from Mr. Goodwin which was attached to the schedule. Although Joel Perfetto, Rouse's vice president, testifies that Rouse notified Interstate of its acceptance of this schedule, Mr. Goodwin denies that Rouse ever made any comment with respect to this "tentative" schedule. As previously noted, this Court relies upon the trial court in determining the credibility of witnesses and we do not find that the evidence otherwise preponderates against the Chancellor's finding that there was no meeting of minds as to the October 20 schedule or any other schedule. We find no convincing written evidence in the record which confirms that Interstate agreed that the schedule of October 20 would be the final schedule for the project and we note that, in fact, there is disagreement within Rouses's own ranks as to which schedule was finally agreed upon. Specifically, Rouse's president, testifies that the agreed upon schedule was the alternative schedule submitted by Interstate on October 17,1997, "to be improved upon." although he further testifies that at the meeting with Mr. Goodwin on January 14, 1998, he presented Mr. Goodwin with the schedule which had been prepared for Grace Baptist Church in November of 1997. In addition, Rouse's project expediter, testifies that it was his understanding that the October 20 schedule was not the final schedule. Based

---

[2]See footnote 1.

on all of this and the record as a whole, we do not find that the evidence preponderates against the Chancellor's finding that there was no meeting of minds between the Parties as to scheduling.

Furthermore, we are not persuaded by Rouse's argument that Interstate's commencement of work on the project after accepting Rouse's bid award shows sufficient meeting of minds to merit a finding of implied contract absent an agreement between the Parties as to the essential element of scheduling and we accept Mr. Goodwin's testimony as adequate explanation of Interstate's continued work in the absence of a written contract:

> We were looking toward the contract. We wanted this job. We had bid this job. We were low bidder on this job and we could do this job. And we were working toward the award of that contract. We were giving Rouse what service we felt we could give them in anticipation of this contract.

Having determined that were was no contract between the Parties, it is not necessary that we address matters relative to the liquidated damages clause and we decline to do so.

Rouses's argument that Interstate is not entitled to the $19,090.00 in damages awarded by the Chancellor for plans and material which Interstate delivered to Rouse when Interstate was working on the project is without merit. Rouse asserts that equity prevents such an award because Interstate quit the project without advance notice, without identifying its steel suppliers or furnishing any steel for the first phase of the project and that it quit even though Mr. Goodwin, its president, admitted that Rouse was not making any unreasonable demands from a scheduling standpoint during January and February of 1998.

As there was no contract between the parties in this case, we do not find that Interstate was required to do any more than it did under the circumstances. Interstate continued to work on the project in anticipation of an acceptable contract which never materialized and in so doing it provided the material and plans for which it seeks compensation. We agree with Interstate's contention that Rouse should have reasonably understood that Interstate expected to be paid for these items and we find that Interstate is entitled to compensation for these items under the doctrine of *quantum meruit*. As provided under Tennessee law *quantum meruit* is appropriate where: (1) there is no existing, enforceable contract, (2) the party seeking recovery provided valuable goods or services, (3) the party to be charged received the goods or services, (4) the circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated, and (5) the circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment. See *Swafford v. Harris*, 967 S.W.2d 319 (Tenn.1998). It is our determination that all prerequisites for allowance of *quantum meruit* damages have been met under the facts of this case.

For the foregoing reasons the judgment of the Chancery Court is affirmed and the cause is remanded for collection of costs below. Costs of appeal are adjudged against Rouse Construction Company and its surety.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE