**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5041-14T2

PETER MOCCO, LORRAINE MOCCO
and FIRST CONNECTICUT
HOLDING GROUP LLC IV,

    Plaintiffs-Appellants/
    Cross-Respondents,

and

LIBERTY HARBOR HOLDING LLC,
THE ATRIUM AT HAMILTON PARK
URBAN RENEWAL ASSOCIATES
LLC, FULTON'S LANDING URBAN
RENEWAL COMPANY LLC,
FIRST CONNECTICUT HOLDING
GROUP LLC II, FIRST
CONNECTICUT HOLDING GROUP
LLC III, FIRST CONNECTICUT
HOLDING GROUP LLC X, FIRST
CONNECTICUT HOLDING GROUP
LLC XI, FIRST CONNECTICUT
HOLDING GROUP LLC XIII,
8-10 CLIFTON PLACE CORP.,
HAMILTON PARK HEALTH CARE
CENTER LTD., LIBERTY HARBOR
MARINA, INC., STONEHYRST
INVESTMENTS, LLC and
A-1 SELF-STORAGE, INC.,

    Plaintiffs,

v.

JAMES J. LICATA and HERBERT

BLAKE,

     Defendants-Respondents/
     Cross-Appellants,

and

DANIEL SHEPRO,

     Defendant-Respondent,

and

CYNTHIA LICATA, EMP WHOLE
LOAN 1, LLC, EMP WHOLE
LOAN 2, LLC, BROADVIEW
FUNDING CORP., TITAN
MANAGEMENT, LP, TITAN
FUNDING, LP, IRA SAFERSTEIN,
OLIVIER COJOT-GOLDBERG,
MICHAEL VRANOS, ANDREW VRANOS,
SWJ HOLDINGS, LLC, STEPHEN
PODELL, WILLIAM MOURNES,
PROSKAUER ROSE LLP, DALE
SCHREIBER, COBRA/VENTURA
EQUITIES LLC, DARE
INVESTMENTS, LLC, CHICAGO
TITLE INSURANCE COMPANY,
HORIZON TITLE AGENCY, INC.,
EAST COAST INVESTMENTS, LLC,
ELLIOT BUCHMAN, SKY LAND
INVESTMENTS, LLC, GREGORY
CRANE, ADVERTISING MANAGEMENT
AND CONSULTING SERVICES, INC.,
RICHARD COAN, TRUSTEE FOR
FIRST CONNECTICUT CONSULTING
GROUP and RONALD CHORCHES,
TRUSTEE FOR JAMES J. LICATA,

     Defendants,

and

CENTRUM FINANCIAL SERVICES,
INC., U.S. BANK, NATIONAL

2

ASSOCIATION, FIRST MUTUAL
BANK and WELLS FARGO, N.A.,

     Defendants/Third-Party
     Plaintiffs-Respondents/
     Cross-Appellants,

v.

ARMANDO J. MOLINA, ESQ.,
GORDON DUVAL, ESQ., and DUVAL
HAWS & MOODY, PC,

     Third-Party Defendants,

and

SHEPRO & BLAKE, LLC,

     Third-Party Defendant/
     Respondent.

Argued May 8, 2018 — Decided June 5, 2018

Before Judges Yannotti, Carroll, and Mawla.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Docket No. L-7709-13.

James A. Scarpone argued the cause for appellants/cross-respondents (Scarpone & Vargo, LLC, attorneys; James A. Scarpone and John B. Nance, on the briefs).

Joseph P. Tucker argued the cause for respondents/cross-appellants Centrum Financial Services, Inc., U.S. Bank, National Association, First Mutual Bank and Wells Fargo Bank, N.A. (Fidelity National Law Group and Chiesa Shahinian & Giantomasi, PC, attorneys; Paul H. Schafhauser, on the brief).

Herbert S. Blake, respondent/cross-appellant pro se.

A-5041-14T2

David J. Montag argued the cause for respondents Daniel Shepro and Shepro & Blake, LLP (Milber Makris Plousadis & Seiden, LLP, attorneys; David J. Montag, on the brief).

PER CURIAM

Plaintiffs Peter Mocco, Lorraine Mocco, and First Connecticut Holding Group IV (FCHG IV) appeal from a June 5, 2015 Chancery Division judgment following a thirty-nine day bench trial. Defendants Centrum Financial Services, Inc., U.S. Bank National Association, First Mutual Bank and Wells Fargo, N.A. (lenders), Herbert Blake, and James J. Licata each cross-appeal from the judgment. Licata's appeal was dismissed for lack of standing. For the following reasons, we affirm.

The underlying facts are thoroughly addressed in the trial judge's lengthy opinion, which we incorporate by reference here. We summarize the essential facts before addressing the parties' claims on appeal.

In the early 1990's, Peter Mocco owned real estate in Jersey City and North Bergen, and experienced financial difficulties. Mocco owed First Union Bank (First Union) approximately $44 million on a loan secured by Mocco's properties. Mocco retained First Connecticut Consulting Group (FCCG), an entity established by Licata, to negotiate with First Union to achieve a discounted

payoff of the loans.  First Union agreed to sell the debt to FCCG for $22 million.

Licata obtained financing to purchase the First Union debt through an entity called EMP Whole Loan I (EMP).  EMP required FCCG or other Licata-owned entities to obtain title to the properties, which would be pledged to secure repayment of the EMP loan.  Licata then created a series of special-purpose entities to hold title to the properties.  The entities were identified as First Connecticut Holding Group (FCHG) I through XIII.

Licata and EMP agreed Licata and his wife Cynthia Licata[1] would share equal ownership of the FCHG entities.  Mocco had a pending bankruptcy action at the time.  The bankruptcy court approved the sale of the Mocco properties to the FCHG entities.

Sometime before September 25, 1996, Mocco and Licata entered into a Three-Page Agreement (TPA), which created a straw-man relationship between Mocco and Licata.  The TPA provided Mocco could regain ownership of the properties when the outstanding debts were retired.  The first closing on the EMP/First Union transactions took place on September 25, 1996.

---

[1] We refer to Cynthia Licata by first name only throughout this opinion so as to differentiate her from James J. Licata. By doing so, we intend no disrespect.

FCCG then cast a vote in favor of Mocco's plan of reorganization at a hearing before the bankruptcy court. Mocco did not reveal the TPA to the bankruptcy court or the creditors. Moreover, the attorney who appeared on behalf of Mocco informed the bankruptcy court there was no relationship between FCCG and Mocco.

In June 1997, properties owned by FCHG V, VII, VIII, IX, and XII were transferred to FCHG IV. As a result of these transfers, FCHG IV became the owner of twenty-two multi-unit apartment buildings in Jersey City and North Bergen. FCHG IV then borrowed funds from Transatlantic Capital to refinance the EMP loans. The Transatlantic loan was secured by the FCHG IV properties.

In April 1999, Peter and Lorraine Mocco filed the underlying complaint in the Chancery Division against Licata and others to compel the re-conveyance of certain properties, including the properties of FCHG IV. The Moccos filed notices of lis pendens related to their claims, but they did not renew the notices, and they lapsed in 2004.

In September 2001, a Chancery Division judge entered an order, which enjoined any party from transferring or encumbering any of the FCHG entities or properties pending further order of the court. In 2002, Licata filed a bankruptcy petition in Connecticut on his own behalf and on behalf of certain entities, including FCHG II,

III, X, XI, and XIII.  FCHG IV was not included in the bankruptcy filing.

Licata then entered into agreements with SWJ Holdings, Inc. (SWJ), under which Licata agreed to sell and transfer certain assets to SWJ.  In return, SWJ agreed to transfer certain interests to Cynthia, including a one-hundred percent interest in FCHG IV.

In June 2005, SWJ was the successful bidder at an auction to purchase the Licata assets.  The bankruptcy court approved the sale of the properties.  The Moccos did not object to the sale; however, in July 2005, they filed a motion to clarify the intent of the bankruptcy court's order approving the sale, which was denied.

In March 2006, the bankruptcy court approved the sale of the Licata properties free and clear of all liens, claims, and encumbrances pursuant to 11 U.S.C. § 363(b).  The properties were then sold or transferred to SWJ, and SWJ transferred one-hundred percent of the membership interests in FCHG IV to Cynthia.

In May 2006, Cynthia sold the FCHG IV properties to SWJ for $31.2 million.  The lenders advanced a purchase money mortgage loan of $15 million to SWJ, secured by three mortgages on FCHG IV properties.  Horizon, the agent for Chicago Title Insurance Company, issued title policies to the lenders.

In this action, the Moccos sought an order declaring them the owners of the FCHG IV properties, and the lenders' mortgages null and void. The lenders' counterclaim sought contribution, indemnification, and equitable relief relating to the mortgages.

The trial judge found: (1) the Moccos are the owners of the properties of FCHG IV; (2) the May 26, 2006 deed conveying the properties owned by FCHG IV to SWJ was null and void; (3) a $1,776,118.53 equitable lien would be imposed in favor of Chicago Title on the FCHG IV properties; and (4) the mortgages held by the lenders would be declared null and void upon satisfaction of the equitable lien.

In their appeal, plaintiffs argue: (1) Horizon and the lenders had actual notice of their ownership claims to the FCHG IV properties; and (2) the trial judge erred by imposing an equitable lien in favor of Chicago Title because the Moccos were not unjustly enriched by retaining their own properties. Plaintiffs also challenge Shepro and Blake's standing in this appeal.

In their cross-appeal, the lenders argue: (1) the doctrine of unclean hands precluded the Moccos from asserting their claims; (2) the TPA between Licata and Mocco is invalid and unenforceable; (3) judicial estoppel barred the Moccos from asserting their claims due to the misrepresentations they made in the bankruptcy proceedings; and (4) the FCHG IV properties were sold free and

clear of all liens and encumbrances in the bankruptcy. The lenders also challenge plaintiffs' standing.

In his cross-appeal, Blake asserts the trial judge barred him from participating in the trial for lack of standing because the trial addressed solely the issue of ownership of FCHG IV. Blake argues his inability to contest the facts at trial exposed him to a malpractice claim because he provided financial and advisory services to his client SWJ. Blake urges us to reverse the judge's determination regarding standing, or alternatively, declare the judgment under review is not res judicata as to him.[2]

I.

We begin by reciting our standard of review.

> Final determinations made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review: "we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]"
>
> [Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (alteration in original) (quoting In re Tr. Created By Agreement Dated Dec. 20, 1961, ex rel. Johnson, 194 N.J. 276, 284 (2008)).]

_____

[2] Blake asserts other arguments, namely, recusal of the trial judge and challenges to the Mocco's ownership of the FCHG IV properties. However, we do not reach these arguments because Blake lacks standing.

"[W]e do not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence." Mountain Hill, LLC v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008) (quoting State v. Barone, 147 N.J. 599, 615 (1997)). "[I]n reviewing the factual findings and conclusions of a trial judge, we are obliged to accord deference to the trial court's credibility determination[s] and the judge's 'feel of the case' based upon his or her opportunity to see and hear the witnesses." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006) (citing Cesare v. Cesare, 154 N.J. 394, 411-13 (1998)).

Our task is not to determine whether an alternative version of the facts has support in the record, but rather, whether "there is substantial evidence in support of the trial judge's findings and conclusions." Rova Farms Resort, Inc. v. Inv'r Ins. Co., 65 N.J. 474, 484 (1974); accord In re Tr. Created By Agreement, 194 N.J. at 284. Legal conclusions, however, are reviewed de novo. Manalapan Realty v. Twp. Comm. of the Twp. of Manalapan, 140 N.J. 366, 378 (1995).

A.

We address the arguments as to standing first. Under New Jersey's standing rules, "[e]ntitlement to sue requires a sufficient stake and real adverseness with respect to the subject

matter of the litigation [and a] substantial likelihood of some harm visited upon the [party] in the event of an unfavorable decision[.]" In re Adoption of Baby T, 160 N.J. 332, 340 (1999) (citations omitted). This is so because "[a] lack of standing by a [party] precludes a court from entertaining any of the substantive issues presented for determination." Ibid.

"Ordinarily, a litigant may not claim standing to assert the rights of a third party." Jersey Shore Med. Ctr.-Fitkin Hosp. v. Estate of Baum, 84 N.J. 137, 144 (1980). "However, standing to assert the rights of third parties is appropriate if the litigant can show sufficient personal stake and adverseness so that the [c]ourt is not asked to render an advisory opinion." Ibid. We review a trial judge's determination regarding standing on a de novo basis. NAACP of Camden Cty. E. v. Foulke Mgmt. Corp., 421 N.J. Super. 404, 444 (App. Div. 2011).

The lenders contend plaintiffs lacked standing to assert a quiet title claim under N.J.S.A. 2A:62-1 because they have not shown "they own and are in peaceable possession of FCHG IV and the [p]roperties." The trial judge concluded "given New Jersey's liberal view of standing [the lender's] standing argument [was] not sufficiently meritorious to merit discussion." We agree.

The lenders sought to collect millions of dollars due under the mortgages on the FCHG IV properties from plaintiffs.

11

Therefore, Mocco had standing to file the quiet title action because he was in "peaceable possession of [the property] and claim[ed] ownership thereof" pursuant to N.J.S.A. 2A:62-1. Further, Mocco had standing to challenge the validity of the lenders' mortgages. See EnviroFinance Grp., LLC v. Envt'l Barrier Co., LLC, 440 N.J. Super. 325, 340 (App. Div. 2015) (holding "[a] financial interest in the outcome ordinarily is sufficient to confer standing") (quoting Strulowitz v. Provident Life & Cas. Ins. Co., 357 N.J. Super. 454, 459 (App. Div. 2003)).

Plaintiffs argue Shepro and Blake lack standing to participate in this appeal because they have never "asserted any ownership or lien rights in any of the disputed properties." Further, Blake did not participate in the trial below and Shepro participated only as a witness.

The right to appeal is "not necessarily preconditioned . . . upon participation in the prior proceeding." N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp. (Exxon Mobil), ___ N.J. Super. ___, ___ (App. Div. 2018) (slip op. at 29). However, "[o]nly a party aggrieved by a judgment may appeal therefrom." Howard Sav. Inst. v. Peep, 34 N.J. 494, 499 (1961). Further, "[i]t is the general rule that to be aggrieved a party must have a personal or pecuniary interest or property right adversely affected by the judgment in question." Ibid.

The trial judge stated the trial was solely to determine ownership of FCHG IV. The judge determined Blake had standing to participate in the damages phase of the trial. We agree.

Neither Blake nor Shepro have a direct pecuniary interest in the ownership of FCHG IV, the mortgages, or the equitable lien imposed by the trial judge. Nor did Blake and Shepro have any liability to the lenders under the mortgages. Moreover, plaintiffs' claims against Blake individually were for trespass, slander of title, and fraud in connection with a sale in the bankruptcy court relating to the FCHG IV properties. The lenders have not asserted any claims against Blake individually.

Thus, Blake and Shepro lacked standing to assert claims in this phase of the trial and similarly lack standing on appeal. We hasten to add neither Blake nor Shepro are bound by the trial judge's findings during the damages phase of this case.

B.

We next address the arguments raised by plaintiffs relating to the underlying judgment. Plaintiffs argue Horizon and Centrum had actual notice of Mocco's ownership claims, and the prior and pending ownership litigation in the bankruptcy court. Plaintiffs assert "[d]espite actual notice of these decisions to Horizon and Centrum, the trial court allowed a full retrial of an expanded version of the same issues." As we discuss below, because we have

affirmed the trial judge's determination on the ownership issue favorably to plaintiffs, we do not reach plaintiffs' arguments regarding the scope of the ownership claims trial.

Plaintiffs argue the trial judge erred by imposing an equitable lien because they were not unjustly enriched. They claim they did not benefit from the Centrum loan because they did not receive any of the loan proceeds. Rather, they contend the trial judge found they had "lost a very substantial amount of money by virtue of the mortgages being placed on the FCHG IV properties since May 2006." Plaintiffs also argue the trial judge's finding they had unclean hands was erroneous.

A court's decision to grant or withhold equitable relief is reviewed for an abuse of discretion, so long as the decision is consistent with applicable legal principles. Marioni v. Roxy Garments Delivery Co., 417 N.J. Super. 269, 275 (App. Div. 2010). A chancery court possesses broad equitable powers. See Cooper v. Nutley Sun Printing Co., 36 N.J. 189, 199 (1961) (noting a "court has the broadest equitable power to grant the appropriate relief"). Because "equity 'will not suffer a wrong without a remedy[,]'" Crane v. Bielski, 15 N.J. 342, 349 (1954), "a court's equitable jurisdiction provides as much flexibility as is warranted by the circumstances[.]" Matejek v. Watson, 449 N.J. Super. 179, 183 (App. Div. 2017). Consequently,

> [e]quitable remedies are distinguished for
> their flexibility, their unlimited variety,
> their adaptability to circumstances, and the
> natural rules which govern their use.  There
> is in fact no limit to their variety in
> application; the court of equity has the power
> of devising its remedy and shaping it so as
> to fit the changing circumstances of every
> case and the complex relations of all the
> parties.
>
> [Ibid. (quoting Sears Roebuck & Co. v. Camp,
> 124 N.J. Eq. 403, 411-12 (E. & A. 1938)).]

Further, a "court can and should mold the relief to fit the

circumstances[.]"  Cooper, 36 N.J. at 199.  Notably,

> "[t]he jurisdiction of a court of equity does
> not depend upon the mere accident whether the
> court has, in some previous case or at some
> distant period of time, granted relief under
> similar circumstances . . . ."  And the mere
> fact that no precedent exists is no sound
> reason for denying relief when the situation
> demands and no other principle forbids.  Every
> just order or rule known to courts of equity
> was born of some emergency, to meet some new
> conditions, and was, therefore, in its time,
> without a precedent.  New remedies and
> unprecedented orders are not unwelcome aids
> to the chancellor to meet the constantly
> varying demands for equitable relief.
>
> [Briscoe v. O'Connor, 115 N.J. Eq. 360, 364-
> 65 (Ch. 1934) (citations omitted).]

Our Supreme Court has stated: "In doing equity, [a] court has

the power to adapt equitable remedies to the particular

circumstances of each particular case."  Rutgers Cas. Ins. Co. v.

LaCroix, 194 N.J. 515, 529 (2008) (alteration in original) (quoting

*Mitchell v. Oksienik*, 380 N.J. Super. 119, 130-31 (App. Div. 2005)). Recently, the Court stated: "A 'court [of equity] must exercise its inherent equitable jurisdiction and decide the case based upon equitable considerations.'" *Thieme v. Aucoin-Thieme*, 227 N.J. 269, 287 (2016) (alteration in original) (quoting *Kingsdorf ex rel. Kingsdorf v. Kingsdorf*, 351 N.J. Super. 144, 157 (App. Div. 2002)). The *Thieme* Court further held "[e]quities arise and stem from facts which call for relief from the strict legal effects of given situations." *Id.* at 288 (alteration in original) (quoting *Carr v. Carr*, 120 N.J. 336, 351 (1990)). Generally, "as between two innocent groups equity will impose the loss on the group whose act first could have prevented the loss." *Zucker v. Silverstein*, 134 N.J. Super. 39, 52 (App. Div. 1975) (citing *Cambridge Acceptance Corp. v. Am. Nat. Motor Inns, Inc.*, 96 N.J. Super. 183, 206 (Ch. Div. 1967)).

The trial judge addressed the Moccos' argument that Mocco could not simultaneously be determined to be the owner of FCHG IV while also being held responsible for the lenders' losses and subject to an equitable lien, because he could not be unjustly enriched by possessing his own properties. The judge invoked the court's broad equitable powers to explain his decision.

> The court recognizes that either or both parties might argue that there is an inconsistency between the court's initial

holding as to Mocco's ownership and the invalidity of the Centrum mortgage and its secondary holding that Mr. Mocco is responsible for part of Centrum's loss. The difference is that real estate decisions are based on strict law which compels the conclusion that a mortgagee who had notice of colorable adverse claims must be precluded from recovering, while in a dispute outside the strict rules governing real estate ownership and mortgage validity, a court of equity may consider which party proximately caused the loss and [had] less clean hands.

The judge set forth a litany of reasons why Mocco was responsible for the lenders' losses and why the lenders were entitled to equitable relief. The judge stated:

[T]here were several acts or omissions by Mr. Mocco which helped lead to the confusion regarding ownership of FCHG IV, which, in turn, helped cause the loss herein:

a. Choosing and continuing to use, as his "consultant" or partner, the unreliable James Licata. That decision led to Mr. Mocco emerging from [b]ankruptcy, but also led to disastrous consequences to others.

b. Drafting and keeping secret the [TPA].

c. Drafting and keeping secret . . . the [e]scrow [a]greement.

d. Drafting extraordinary complex corporate stock ownership documents.

e. Not renewing the notices of lis pendens.

f. Not recording [the court's] 2001 order [restraining the sale and transfer of FCHG IV's assets].

g. Not reminding [the bankruptcy judge], or Mr. Licata's lawyers, about [the] 2001 [o]rder.

h. Not appealing [the bankruptcy court's] denial of [the] modification motion.

i. Not appealing the [section] 363 order.

j. Allegedly failing to adequately warn and inform potential buyers and/or lenders that he owned the properties. . . .

Some of what Mr. Mocco did leading to Centrum's loss was intentional. The intentional actions in many respects caused more culpability than the unintentional or negligent acts and omissions. This is for two reasons. First, negligence normally requires a duty, and it is not clear that Mr. Mocco owed a duty to Horizon, Centrum[,] and Chicago. Second, while the failure to update the notices of lis pendens was wrong as a matter of law, at least four of the other allegedly negligent acts—not recording [the] 2001 order, not reminding [the bankruptcy judge] or Mr. Licata's lawyers of [the 2001] order, not appealing [the bankruptcy judge's] denial of the modification motion, and not appealing the [section] 363 order—could be characterized as legal judgment calls. The intentional decisions, however, cannot be as easily dismissed.

After addressing in detail the role of Horizon and the lenders' agent in committing negligent acts or omissions leading

18

to the lenders' loss, the judge apportioned the parties' share of the liability. He stated:

> One can argue that Mr. Mocco's actions proximately caused the loss since Mr. Mocco's actions set in motion the chain of events[,] which led to the confusion[,] which led to the loss. On the other hand, the [l]enders through their agent, Horizon, had the last clear chance to avoid the loss. This court, as the fact finder, concludes that [fifty percent] of the proximate cause is attributable to Mr. Mocco and [fifty percent] attributable to the [l]enders.

The trial judge determined the lenders' loss totaled $3,552,237.06, representing the lenders' out-of-pocket expenses. The judge awarded the lenders one-half of this sum, $1,776,118.53.

The imposition of an equitable lien in favor of the lenders was supported by the substantial, adequate, and credible evidence in the record. We are satisfied the trial judge did not abuse his discretion in according the lenders the remedy of an equitable lien. For the same reasons, we reject the alternative argument advanced by the lenders in the cross-appeal, namely, that we increase the amount of the equitable lien commensurate with their entire out-of-pocket expense.

C.

We next address the lenders' challenge to the trial judge's determination regarding ownership of FCHG IV, which in turn invalidated the lenders' mortgages on the properties held by FCHG IV. The lenders argue Mocco's unclean hands should have barred his ability to seek equitable relief. The lenders contend the TPA was invalid and unenforceable because it violated the Statute of Frauds. They also challenge the validity of the TPA based on res judicata and public policy reasons. The lenders argue "the Moccos should have been barred by the doctrine of judicial estoppel" because of misrepresentations made in Mocco's and Licata's bankruptcy proceedings. The lenders further argue the 363 sale "was free and clear of any liens, claims or encumbrances with respect to ownership of [FCHG IV]." The lenders also assert plaintiffs' failure to renew the lis pendens filed in 1999 constituted lack of notice of the plaintiffs' pending lawsuit. We address these arguments in turn.

i.

"The essence of the doctrine of unclean hands, '. . . is that a suitor in equity must come into court with clean hands and he must keep them clean after his entry and throughout the proceedings.'" U.S. Bank Nat'l Ass'n v. Curcio, 444 N.J. Super. 94, 113 (App. Div. 2016) (quoting Marino v. Marino, 200 N.J. 315,

345 (2009)). However, "[r]elief is not to be denied because of general iniquitous conduct on the part of the complainant or because of [his] wrongdoing in the course of a transaction between him and a third person." United Bd. & Carton Corp. v. Britting, 61 N.J. Super. 340, 344 (App Div. 1960) (quoting 19 Am. Jur., Equity, § 473, p. 327). Rather, the doctrine is applied only where one seeking relief has "acted fraudulently or unconscionably with respect to the particular controversy in issue." Med. Fabrics Co. v. D.C. McLintock Co., 12 N.J. Super. 177, 180 (App. Div. 1951); accord Heuer v. Heuer, 152 N.J. 226, 238 (1998); Neubeck v. Neubeck, 94 N.J. Eq. 167, 170 (E. & A. 1922).

Application of the doctrine of unclean hands is "discretionary on the part of the court[.]" Borough of Princeton v. Bd. of Chosen Freeholders, 169 N.J. 135, 158 (2001) (quoting Heuer, 152 N.J. at 238). Thus, our review of this issue is for abuse of discretion.

The trial judge found Mocco was "the owner of [one hundred percent] of the legal and equitable interest in FCHG IV[,]" and Licata held title to the FCHG properties as his nominee. The judge relied on (1) the consulting agreement between Mocco and FCCG; (2) the TPA; (3) the escrow agreement; (4) a September 24, 1996, facsimile from Pieter J. de Jong, Licata's attorney, to

Licata;[3] and (5) the contract for purchase of real estate[4] between Licata and Mocco, which the judge found "generally support[ed] the concept that . . . Mocco could buy the property back from . . . Licata for [one dollar], if he satisfi[ed] the mortgage[.]"

Based on the testimony, the judge also made the following findings: (1) "Mocco [was] a man whose entire energies [were] devoted to building, and holding real property[,]" and his "mode of business ma[de] it unlikely he would give up ownership of the FCHG IV properties;" (2) "[t]he Moccos ran all the FCHG properties, collected the rents, paid the mortgages [and] Licata never paid a dime of the mortgage payments;" (3) the credibility of Brian Opert, FCCG's executive vice president, was "generally strong" and his testimony "bolstered . . . Mocco's assertions about . . . Licata's nominee status;" (4) "the [bankruptcy court's] trial transcript and the [bankruptcy court] [d]ecisions [led' to the conclusion[] that . . . Licata held title to the FCHG entities as a nominee;" (5) "the Mocco-Licata relationship as to FCHG IV, which was inadvertently omitted from the Licata [b]ankruptcy proceeding" did not materially differ from their relationship as to the FCHG LLCs that were the subject of the bankruptcy decisions; (6)

---

[3]   We have not been provided with this document.

[4]   See footnote 3.

conversations with Licata, which were taped by Mocco, supported his contention that Licata was his nominee; (7) "[h]aving someone else hold his property in a nominee status was a common business practice for . . . Mocco;" (8) Mocco was a "relatively straight-forward, honest witness, at least on this issue" and his testimony was "somewhat more believable" than Licata's; and (9) "Mocco [was] such a tough, uncompromising man that the court [could not] imagine him giving up the property in question" and did not believe it was "possible he would have agreed to letting . . . Licata or anyone else take a portion, let alone a substantial portion, of his empire[.]"

The lenders' argument as to plaintiffs' unclean hands goes to the weight of the evidence. The judge's detailed findings support the conclusion the unclean hands doctrine should not be applied, and demonstrate the judge did not abuse his discretion.

## ii.

The lenders contend the TPA was invalid and unenforceable because it violated the Statute of Frauds, specifically N.J.S.A. 25:1-11, the writing requirement for conveyance of real estate, and N.J.S.A. 25:1-13, the enforceability of agreements regarding real estate. The lenders assert FCCG did not execute the agreement, which would have required the written consent of its board members, and it was not signed by Mocco. Further, the

23

lenders contend the agreement failed to specify the nature of the interest to be transferred, the properties encompassed by the agreement, or that FCCG or Licata was agreeing to act as Mocco's nominee. In addition, the lenders claim hand-written changes to the document were not initialed.

The trial judge declined to address the lenders' argument regarding the Statute of Frauds because the TPA did not convey real estate. Moreover, the judge noted "there [was] enough proof that the Moccos owned the real estate that [he] could rule in favor of their ownership even if the [TPA] were considered unenforceable on account of the Statute of Frauds[.]"

We are not persuaded the trial judge abused his discretion. The lenders focus on the TPA, yet do not challenge the validity of the escrow agreement. The escrow agreement was executed by the Moccos and Licatas approximately seven months after Mocco's bankruptcy reorganization plan was confirmed, and expressly incorporated the TPA. Assuming the TPA violated the Statute of Frauds when Licata initially signed it in September 1996, or that it was rendered ineffective by the confirmation order, the escrow agreement, executed in May 1997, survived, and provided for the re-conveyance of the ownership interests in the FCHG LLCs to a person or entity of Mocco's choosing. For these same reasons, the lenders' arguments the TPA is void for public policy and the

24

bankruptcy confirmation order was res judicata because it "wiped out" the TPA, lack merit.

### iii.

Judicial estoppel did not bar Mocco from prosecuting his claim to ownership of FCHG IV by failing to disclose its existence to the bankruptcy court. The judge determined "Mocco had no duty to bring FCHG IV into the [b]ankruptcy proceedings."

We review a trial court's decision whether to invoke the doctrine of "judicial estoppel using an abuse of discretion standard." In re Declaratory Judgment Actions Filed by Various Municipalities, 446 N.J. Super. 259, 291 (App. Div. 2016). "Judicial estoppel is an extraordinary remedy [and] should be invoked only to prevent a miscarriage of justice." Bhagat v. Bhagat, 217 N.J. 22, 37 (2014) (citations omitted). "[B]ecause of its draconian consequences," judicial estoppel is a disfavored remedy that is "invoked only in limited circumstances[.]" In re Declaratory Judgment Actions, 446 N.J. Super. at 292.

Under the doctrine of judicial estoppel, "[a] party who advances a position in earlier litigation that is accepted and permits the party to prevail in that litigation is barred from advocating a contrary position in subsequent litigation to the prejudice of the adverse party." Bhagat, 217 N.J. at 36. "The purpose of the . . . doctrine is to protect 'the integrity of the

judicial process.'" Kimball Int'l, Inc. v. Northfield Metal Prods., 334 N.J. Super. 596, 606 (App. Div. 2000) (quoting Cummings v. Bahr, 295 N.J. Super. 374, 387 (App. Div. 1996)). "Consequently, '[a]bsent judicial acceptance of the inconsistent position, application of [the doctrine] is unwarranted because no risk of inconsistent results exists [and] the integrity of the judicial process is unaffected[.]'" Id. at 607 (quoting Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 599 (6th Cir. 1982)).

Here, the trial judge declined to apply judicial estoppel because he found "nothing said or done, or not said or done" by Mocco during Licata's bankruptcy proceedings "could be considered inconsistent with any other position taken by [him.]" The judge also found the lenders had "failed to establish that . . . Mocco affirmatively stated to the bankruptcy court that he no longer owned the FCHG entities[.]" Moreover, "there [was] insufficient proof [the bankruptcy court], the unsecured creditors, or [E]MP [were] led to believe that . . . Mocco did not own and control the FCHG IV properties[.]" The judge determined "no one relied on or even cared about the intricacies of the Mocco-Licata relationship[.]" The trial judge agreed with the bankruptcy court's ruling "there [was] no risk of inconsistent results; the bankruptcy court was not asked to rule and did not rule one way or the other on the nature of the transferred title[.]"

26

The trial judge correctly determined there was no risk of inconsistent results between Mocco's bankruptcy matter and this matter. Our review of the record shows the question of who owned the FCHG LLCs was not before the bankruptcy court. Thus, the trial judge did not abuse his discretion by declining to apply judicial estoppel to bar Mocco's claims. For essentially the same reasons, we conclude plaintiff's claims are not barred by laches or estoppel.

iv.

The judge determined Mocco's claims were not barred by the failure to update the lis pendens for FCHG IV. Whether the failure to renew the notices of lis pendens bars Mocco's claims is a question of law. Therefore, our review is de novo. State v. Robinson, 448 N.J. Super. 501, 516 (App. Div. 2017). Whether Horizon and/or Centrum had actual notice of Mocco's claims when the mortgages were executed is a question of fact, requiring us to uphold the trial judge's finding if it is supported by sufficient credible evidence in the record. Brunson v. Affinity Fed. Credit Union, 199 N.J. 381, 397 (2009).

"Under the common law doctrine of lis pendens, the filing of a lawsuit served as constructive notice to any subsequent purchaser or lienholder that title to the property was contested." Manzo v. Shawmut Bank, N.A., 291 N.J. Super. 194, 199 (App. Div. 1996).

27

"[O]ne who acquired the property from a party litigant while the suit was pending took the property subject to the outcome of the action, despite having received no actual notice." Chrysler Corp. v. Fedders Corp., 670 F.2d 1316, 1319 (3d Cir. 1982); accord Haughwout v. Murphy, 22 N.J. Eq. 531, 545 (E. & A. 1871).

"Our statute providing for the filing of a notice of lis pendens was adopted to ameliorate the hardship involved in good faith conveyances where there was no notice of suit in the public registry." Gen. Elec. Credit Corp. v. Winnebago of N.J., Inc., 149 N.J. Super. 81, 85 (App. Div. 1977) (citing Wood v. Price, 79 N.J. Eq. 620, 622 (E. & A. 1911)). "The effect of the filing of a notice of lis pendens is constructive notice of a pending action concerning . . . real estate, and a purchaser or mortgagee takes subject to the outcome of the lawsuit." Trus Joist Corp. v. Treetop Assocs., 97 N.J. 22, 31 (1984); N.J.S.A. 2A:15-7. "The primary purpose of the notice of lis pendens is to preserve the property which is the subject matter of the lawsuit from actions of the property owner so that full judicial relief can be granted, if the plaintiff prevails." Manzo, 291 N.J. Super. at 200.

A notice of lis pendens is effective for five years from the date of its filing. N.J.S.A. 2A:15-11. There are no provisions in the lis pendens statute for renewing or extending a notice of lis pendens. Manzo, 291 N.J. Super. at 199. However, in Manzo,

the court held "the notice of lis pendens affects any party who obtains an interest in the property during the effective term of the notice and until the final resolution of the litigation[.]" Id. at 202.

Here, Centrum acquired its interest in the FCHG IV properties in May 2006, after the effective term of the notices of lis pendens, which were filed on November 1, 1999, had expired. Thus, the notices of lis pendens did not provide Centrum with constructive notice of Mocco's claims. Nevertheless, the judge found even though Mocco should have updated the notices of lis pendens, the "title searchers did report the original notices, and [Horizon] did know of . . . Mocco's claims[.]" We agree.

The failure to re-file the notices of lis pendens did not bar Mocco's claims because the lenders had actual notice of the claims. We have previously stated: "If a purchaser or lienor is faced with extraordinary, suspicious, and unusual facts which should prompt an inquiry, it is equivalent to notice of the fact in question." Howard v. Diolosa, 241 N.J. Super. 222, 232 (App. Div. 1990). "The efficacy of notice by actual possession applies to a person proposing to take a mortgage on the property." Clawans v. Ordway Bldg. & Loan Ass'n, 112 N.J. Eq. 280, 285 (E. & A. 1933). The intending mortgagee must "inquire of the occupant and ascertain the rights under which he holds[.]" Id. at 284 (quoting LaCombe

v. Headley, 91 N.J. Eq. 63, 66 (E. & A. 1919)). If no inquiry is made, the mortgagee "is chargeable with notice of such facts as the inquiry, if it had been in fact made, would have revealed." Id. at 285.

The trial judge's determination the lenders had notice of Mocco's claims to ownership of FCHG IV at the time the mortgages were executed is adequately supported by the record. The record demonstrates the lenders knew Mocco was collecting the rents for the property, which at a minimum, required them to inquire further as to his role and potential ownership interest.

Indeed, Centrum's attorney, Kenneth R. Sauter, received an email from the broker, which stated:

> As we all know, this [M]occo guy allegedly is the management company. If this is the case, my understanding of the hold back ($3.5M) was specifically structured to ensure our position so that the borrower would have the incentive to do what is necessary to get control back of the properties . . . .

In the same email chain, Sauter responded: "I don't know who 'this [M]occo guy' is. And if the borrower is having trouble getting the cooperation of 'Mocco,' is that supposed to provide a greater degree of comfort to the lender?" At trial, Bruce Berreth, Centrum's president, testified Centrum received the aforementioned emails before it made the loans and that they "knew what the situation was."

Other emails in evidence directed to and from Berreth also show he was aware of Mocco's claim to FCHG IV. On May 4, 2006, Berreth received an email from Aegis J. Frumento, an attorney Licata had retained to "help facilitate the sale," responding to the "question concerning substantiation that [the Licatas] own[e]d [one hundred percent] of [FCHG IV]." Specifically, Frumento forwarded an email from Shepro dated May 3, 2006. Shepro's email explained both Cynthia and Mocco might claim ownership of FCHG IV, and that another attorney "may be holding the [FCHG] IV [membership] certificates" under an order signed by a Chancery Division judge at the outset of litigation. Frumento's response to Berreth was "Mocco may claim they own [FCHG IV] 'in trust' for him[.]"

On May 21, 2006, Berreth emailed Sauter stating:

> Paragraph 3(b) [of the title insurance policy] excludes things known to us but not of record or known to the title company. As a result, it is imperative we can document that they are aware of any interest claimed by Peter Mocco . . . . Please be sure David [Cohn[5]] is aware of Mocco's potential interest and that we can verify it if necessary.

---

[5] According to the trial judge, Cohn was "a very experienced title searcher and officer [of Horizon] and . . . was the principal title searcher when the loan in question was made."

Sauter responded, "I am not sure what title issues may exist [regarding] Peter Mocco . . . . You will get a clean policy, but I will expressly review this with David Cohn."

The record demonstrates Centrum had notice of Mocco's claimed ownership interest in FCHG IV, but believed it was protected by its title insurance policy. The record also shows Horizon, as Chicago Title's agent, had notice of Mocco's interests through the notes from Cohn's telephone conversation with de Jong, and emails copied to Cohn referencing Mocco's possession of the properties and his claimed interests.

As the trial judge noted, aspects of the transaction "were disturbing enough cumulatively to convince a careful title insurer and/or lender to either make a very extensive inquiry or not to proceed any further." Indeed, Cohn, two of Licata's associates, and Shepro signed a confidentiality agreement at the closing agreeing to keep the closing confidential. No one who testified at trial was able to explain who requested the confidentiality agreement or why it was signed. Additionally, Centrum entered into an "Agreement for Disbursement of Funds After Closing" with SWJ, which expressly recognized SWJ had been "unable to confirm, to the satisfaction of the Lenders . . . the leases, rents and <u>rights</u> to the proceeds of leases and rents arising out of and in

connection with the properties which [were] the subject of the [loans.]" (Emphasis added).

The record amply supports the result reached by the judge regarding notice to the lenders. Under the circumstances, the failure to update the lis pendens did not bar relief to plaintiffs.

v.

The lenders assert the bankruptcy court sold plaintiffs' interest in FCHG IV. We disagree.

Whether the bankruptcy sale barred Mocco's claim to ownership of FCHG IV in May 2006, is a question of law. Therefore, our review is de novo. Robinson, 448 N.J. Super. at 516.

Under 11 U.S.C. § 363(b), "a bankruptcy trustee [may] 'sell . . . property of the estate' after notice and hearing." Parker v. Goodman (In re Parker), 499 F.3d 616, 620 (6th Cir. 2007). "Purchasers of the[] assets are protected from a reversal of the sale on appeal so long as they acted in good faith." Licensing by Paolo v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d Cir. 1997). That protection is afforded by 11 U.S.C. § 363(m), which states:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the

appeal, unless such authorization and such sale . . . were stayed pending appeal.

The Court of Appeals for the Seventh Circuit has commented regarding the finality of sales approved pursuant to section 363 and stated:

> Finality is important because it minimizes the chance that purchasers will be dragged into endless rounds of litigation to determine who has what rights in the property. Without the degree of finality provided by the stay requirement, purchasers are likely to demand a steep discount for investing in the property.
>
> [In re Sax, 796 F.2d 994, 998 (7th Cir. 1986).]

Here, however, the bankruptcy court expressly stated the 363 sale did not adjudicate the issue of FCHG IV's ownership. The trial judge made this determination after he reviewed the transcripts of the bankruptcy proceeding, and concluded "[the bankruptcy judge] never intended that his orders divested . . . Mocco of ownership."

Although we have not been provided with the transcripts of the bankruptcy proceedings on appeal, the trial judge quoted them, specifically where counsel for the creditors' committee explained that:

> [T]he debtor is selling whatever interest it has, if it has any interest in the assets that are listed in the schedules.
>
> To the extent it does not have an interest[,]

34

> does not own part or all of the assets . . .
> that's not being sold.  So what we mean by
> that [is] . . . we're not creating any
> substantive rights.  To the extent that an
> asset is transferred to the purchaser . . .
> only the debtor's interests in that asset are
> being transferred.  To the extent that . . .
> Mocco or anybody else claims an ownership in
> the assets, that ownership is preserved
> . . . .  There's no transfer of that asset
> over somebody else's ownership interest.

When the bankruptcy judge commented Mocco would not "lose [his] rights by virtue of the sale," counsel for SWJ, responded: "But they do . . . not lose whatever rights they have in that asset.  However, the sale would be free and clear of encumbrances, subject to defenses."  The bankruptcy judge replied:

> That's right.  So long as any and all
> interests, rights, claims are preserved and
> they be prosecuted against the dollar amount
> that is collected, <u>or, if it isn't property
> of the estate, then it's off this [c]ourt's
> jurisdiction, and the bottom line is that all
> rights are preserved</u>.
>
> [(Emphasis added).]

The bankruptcy judge also stated the Moccos were "going to be in the same position after the sale as they were before the sale insofar as whatever rights, if any, they have."

The trial judge also reviewed the record of a March 8, 2006 hearing before the bankruptcy judge to address the language of the final 363 sale order, and found it supported the finding the sale did not affect Mocco's ownership rights.  Reciting from the

transcript, the trial judge noted Mocco's counsel asked for language to be added to the order stating Mocco's rights "to and in the assets being sold shall not be affected by this sale and shall be determined in future litigation in a non-bankruptcy forum." An unidentified party then read the language from Paragraph 17 of the November 16, 2005 order, which had preserved Mocco's rights, to the bankruptcy judge. The bankruptcy judge then asked if there was similar language in the proposed order, and was assured by the attorneys the language would be included.

When counsel for SWJ argued Mocco's rights would be limited, the bankruptcy judge responded: "I should think that they'd reserve all of — whatever rights they might have. That's what he's been asking to do and I think that it's understood that he will be able to do it." When SWJ's counsel persisted, the judge replied: "Not subject to anything. I'm telling you, sir, . . . I [cannot] say this any more clearly. Whoever has a right will continue to have that right after this order is entered . . . ." This colloquy demonstrates the bankruptcy court understood its previous orders addressed Mocco's concern the 363 sale did not affect his ownership rights to FCHG IV.

Additional support for the trial judge's conclusion Mocco's claims were not barred by the 363 sale is found in an order entered by the bankruptcy judge on July 1, 2014. In the order, the

bankruptcy judge had denied a motion for contempt filed by SWJ claiming Mocco had ignored the 363 sale orders by taking action to "impede [SWJ's] court-ordered fee title interest." The order stated the bankruptcy court had denied the motion because the June 21, 2005, November 16, 2005, and March 9, 2006, orders "were sales of property subject to the rights of the Mocco [p]arties as those rights were previously or are subsequently determined by a court of competent jurisdiction, including, without limitation [the New Jersey Superior Court.]"

Also, in an October 9, 2014 order approving the bankruptcy trustees' settlement with Mocco, the bankruptcy judge noted the pending New Jersey Superior Court case would determine "whether the bankruptcy estates or Mocco own[ed] certain [FCHG] LLCs." This order referred to the assets of the bankruptcy estates, including "interests" in FCHG IV.

Therefore, we agree with the trial judge's conclusion the bankruptcy court never intended the 363 sale would terminate Mocco's rights to FCHG IV. Indeed, the trial judge concluded:

> If anything [was] absolutely clear in the tortured sixteen year history of this case, it [was the bankruptcy judge] never intended the [section] 363 sale to transfer anything other than . . . Licata's claim to the FCHG IV assets. He never intended to allow a sale which would transfer all right, title and interest to the assets, in derogation of . . . Mocco's rights.

The judge further found the 363 sale could not bar Mocco's claim because he could not be divested of his assets without due process, which the sale did not afford Mocco.

The trial judge rejected the lenders' argument they had obtained good title to FCHG IV from Cynthia. The judge found Mocco gave Licata title to the Holding Group LLCs as nominee and that Licata could not give Cynthia "any greater rights than he possessed[.]" The judge also noted Cynthia "never paid any money for the rights to FCHG IV, never listed herself as the owner of the FCHG IV properties, never paid any money toward the FCHG IV mortgage, never knew what properties FCHG IV possessed, and never claimed ownership of FCHG IV[.]" In addition, the judge noted a divorce-related separation agreement between the Licatas stated that Licata, not Cynthia, "kept all the rights to the FCHG properties involved in the Mocco dispute[.]"

We have no basis to disturb the judge's findings. Our de novo review leads us to the same conclusion. SWJ purchased only Licata's claims to ownership of FCHG IV. Therefore, the 363 sale did not bar Mocco's ownership claims.

For the foregoing reasons, the June 5, 2015 judgment is affirmed. To the extent that we have not addressed the other arguments raised in the appeal and cross-appeals, it is because

they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION